(107 So. 791)

## DOUGLASS v. STATE. (8 Div. 402.)

(Court of Appeals of Alabama. March 16, 1926.)

**1. Robbery ⬡1.**

The common law prevails in Alabama as to offense of robbery; Code 1923, § 5460, merely prescribing punishment therefor.

**2. Robbery ⬡1 — Common-law "robbery" is felonious taking of money or valuable goods from person of another or in his presence by violence or by putting him in fear.**

Robbery at common law is offense against both person and property, and is felonious taking of money or goods of value from person of another or in his presence by violence or by putting him in fear.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Robbery.]

**3. Indictment and information ⬡19.**

Counts of indictment charging assault with intent to rob in form prescribed by Code 1923, p. 480, form 16, *held* sufficient.

**4. Robbery ⬡19—Count charging assault on cashier with intent to rob bank held not bad.**

Count charging assault on cashier with intent to rob bank *held* not bad; it being unnecessary that property taken be that of person from whom taken.

**5. Criminal law ⬡304(2)—Court judicially knows that cashier is officer intrusted with, and whose duty it is to take care of, bank's cash or money.**

Court of Appeals judicially knows that cashier is officer intrusted with, and whose duty it is to take care of, bank's cash or money.

**6. Robbery ⬡9—Words "taking from the person of another" in common-law definition of robbery include taking, by violence or intimidation, from person wronged, of property which belongs to him or is under his protection and control.**

Words "taking from the person of another" in common-law definition of robbery are not restricted in application to cases in which property taken is in actual contact with person of one from whom taken, but include taking by violence or intimidation from person wronged, in his presence, of property which belongs to him or is under his personal protection and control.

**7. Robbery ⬡4—To constitute robbery, property taken need not be property of person from whom taken.**

To constitute robbery, property taken must be that of another than one who takes it, but it need not be property of person from whom taken.

**8. Criminal law ⬡308.**

Defendant is presumed innocent throughout trial or until proved guilty by required measure of proof and established rules of evidence.

**9. Criminal law ⬡311.**

Defendant's sanity is presumed.

**10. Criminal law ⬡46.**

No person can commit an offense who is not legally capable of committing a crime.

**11. Criminal law ⬡570(2).**

Under Code 1923, § 4572, reasonable doubt of accused's irresponsibility will not authorize acquittal; clear proof thereof to reasonable satisfaction of jury being required.

**12. Criminal law ⬡740.**

In prosecution for assault with intent to rob, accused's insanity was for jury.

**13. Criminal law ⬡1063(4).**

Where no motion for new trial was made, appellate court cannot pass on sufficiency of evidence of accused's insanity.

**14. Robbery ⬡23(1) — Question to cashier whether bank lost money on afternoon accused entered it held too broad and general in trial for assault on cashier to rob bank.**

In prosecution for assault on cashier with intent to rob bank, question to cashier whether bank lost any money on afternoon defendant went into it was too broad and general and may have related to transactions with parties wholly disconnected with defendant, so that objection thereto was properly sustained.

**15. Robbery ⬡23(1)—Exclusion of cashier's testimony as to whether defendant got or attempted to get money from bank or cashier and whether latter knew of overt act to get money from within cage held reversible error; testimony being admissible as of res gestæ and relevant on issues of intent and insanity.**

In prosecution for assault on cashier with intent to rob bank, exclusion of cashier's testimony as to whether defendant got or attempted to get any money from bank or cashier, and whether latter knew of any overt act of defendant to get money from within cage, *held* reversible error; such testimony being admissible as of res gestæ and relevant on questions of defendant's intent and insanity.

**16. Criminal law ⬡1036(1).**

Inadmissibility of testimony as to conversation in absence of accused is not presented for consideration on appeal, where no objection was made to its admission.

**17. Criminal law ⬡338(4, 5)—Testimony as to conversation with person assaulted in absence of defendant held inadmissible in trial for assault to rob, being res inter alios.**

In prosecution for assault on cashier with intent to rob bank, testimony as to witness' conversation with cashier in absence of defendant after he had left bank on former visit was irrelevant and inadmissible, being res inter alios.

**18. Criminal law ⬡1170(4)—Error in excluding testimony as to conduct of accused, alleging insanity, as observed by witness intimate with him, was cured, where witness gave evidence sought notwithstanding rulings.**

In prosecution wherein insanity was defense, error in sustaining objections to questions to witness intimate with defendant as to latter's conduct, as observed by witness, was cured,

where witness gave evidence sought notwithstanding rulings.

**19. Criminal law ⚖=1086(14)—Error in court's statement limiting question to witness as to defendant's insanity at time of crime. is not prosecuted where record shows no exception reserved.**

Error in court's statement that question whether witness considered defendant insane would have to be at time of crime, not before or after, is not presented for review, where record shows no exception reserved.

**20. Criminal law ⚖=448(2), 1170(4)—Question whether witness found any evidence of accused having been at certain place held objectionable as too general and calling for conclusion and sustaining objection harmless where witness afterward testified as to what he found.**

In prosecution for assault with intent to rob, question whether witness found any evidence of accused's having been at certain place was objectionable as too general and calling for conclusion and deduction of witness, and sustaining objection thereto was harmless where witness was afterward permitted to testify in detail as to what he found.

**21. Criminal law ⚖=456, 1170(4) — Rejecting testimony whether accused looked like crazy man held not reversible error in view of lack of evidence that witness had ever seen crazy man and witness was later allowed to testify as to observation of accused's conduct.**

In prosecution wherein defense was insanity, sustaining objection to question whether accused looked like a crazy man to witness *held* not reversible error, where there was no evidence that witness had ever seen or knew how a crazy man would look, and witness was permitted to give opinion as to defendant's insanity and to testify in detail to his unusual acts and conduct.

**22. Criminal law ⚖=452(2)—Court erred in sustaining objection to question as to accused's insanity where witness was qualified from association with and opportunity to observe accused to express opinion as layman.**

Where defense was insanity, court erred in sustaining objection to question whether witness could say accused was sane or insane, where witness was qualified through association with and opportunity to observe accused to express opinion as layman.

**23. Criminal law ⚖=456.**

A layman may express his opinion as to sanity or insanity of defendant, where sufficient premise is shown.

**24. Criminal law ⚖=448(2)—Question whether witness knew accused better than anybody else held objectionable as calling for conclusion of witness and necessitating a comparison impossible of attainment.**

Where defense was insanity, court did not err in not permitting accused's sweetheart to answer question whether she knew accused better than anybody else; question calling for conclusion and necessitating comparison impossible of attainment.

**25. Criminal law ⚖=304(5).**

Court of Appeals takes judicial knowledge of State Insane Asylum at Tuscaloosa.

**26. Criminal law ⚖=481.**

Competency of expert is question for court, not jury.

**27. Criminal law ⚖=1168(3)—Sustaining objection to question to insanity expert as to number of people under his observation in insane asylum held not error requiring reversal.**

Where defense was insanity, it was not reversible error to sustain objection to question to expert on insanity as to average number of persons under his observation in state insane asylum.

**28. Criminal law ⚖=485(2).**

An expert witness may give opinion as to sanity or insanity of defendant based solely upon hypothetical question, and without personal knowledge or acquaintance with person inquired of.

**29. Criminal law ⚖=485(2) — Where facts on question of insanity are undisputed, hypothetical questions to expert should embrace substantially all facts, but, where evidence is conflicting, should embrace only facts tending to support theory.**

Where there is no dispute as to facts on question of accused's insanity, hypothetical questions to experts should embrace substantially all the facts; but where there is conflict in evidence, question should embrace only facts tending to support particular theory, and generally should not contain matter as to which there is no supporting evidence.

**30. Criminal law ⚖=1170½(1)—Excluding answers to proper hypothetical questions to expert on insanity held reversible error.**

It was reversible error not to permit expert on insanity to answer hypothetical questions which fully met rules as to facts embraced.

**31. Criminal law ⚖=683(2)—That evidence admitted in rebuttal was not strictly rebuttal was not sufficient to show error, where questions related to matters in which court may exercise reasonable discretion.**

Mere fact that evidence admitted on rebuttal by state was not strictly in rebuttal was not sufficient to put court in error, where questions related to matters in which court may exercise reasonable discretion.

**32. Criminal law ⚖=835, 836.**

Court is under no duty to give his reasons for refusal of charge, and need only write "given" or "refused" thereon.

**33. Criminal law ⚖=829(1) — Where oral charge given with requested charges of defendants substantially and fairly covered all of refused charges, court was under no duty to give requested charges, though they contained correct propositions of law.**

Where oral charge given with requested charges fairly and substantially cover each refused charge, court need not give requested charges, though they contain correct propositions of law.

---

**34. Criminal law ⬤═48.**

It is not purpose of law to hold a totally irresponsible person, a person of disordered and deranged mind, accountable for his acts.

Appeal from Circuit Court, Franklin County; C. P. Almon, Judge.

William J. Douglass was convicted of assault with intent to rob, and he appeals. Reversed and remanded.

Williams & Chenault, of Russellville, A. H. Carmichael, of Tuscumbia, and Mason Douglass, of Dayton, Ohio, for appellant.

The demurrer to the indictment should have been sustained. Noble v. State, 59 Ala. 73; State v. Seay, 3 Stew. 123, 20 Am. Dec. 66; Stein v. State, 37 Ala. 123; 34 Cyc. 1812. The state failed to prove an intent to rob, and the affirmative charge should have been given. Taylor v. State, 101 So. 160, 20 Ala. App. 161. Evidence of insanity before and after commission of the crime is admissible. McAllister v. State, 17 Ala. 434, 52 Am. Dec. 180; McLean v. State, 16 Ala. 672; Gardner v. State, 11 So. 402, 96 Ala. 12; Cawley v. State, 32 So. 227, 133 Ala. 128; Gilbert v. State, 56 So. 136, 172 Ala. 386. An attempt cannot be shown without proof of an overt act. Comm. v. Eagan, 42 A. 374, 190 Pa. 10; Jones v. State, 8 So. 383, 90 Ala. 628, 24 Am. St. Rep. 850; Walls v. State, 8 So. 680, 90 Ala. 618; Morgan v. State, 33 Ala. 413; 8 R. C. L. 182; Maddox v. State, 48 So. 689, 159 Ala. 53. As to expert testimony, see Choice v. State, 31 Ga. 424; Pannell v. Com. 86 Pa. 260; Davis v. State, 35 Ind. 496, 9 Am. Rep. 760; Fairchild v. Bascomb, 35 Vt. 398; 17 C. J. 228; Porter v. State, 33 So. 694, 135 Ala. 51. Every act of defendant's life is relevant on a plea of insanity. Howard v. State, 55 So. 255, 172 Ala. 402, 34 L. R. A. (N. S.) 990.

Harwell G. Davis, Atty. Gen., and Robert G. Tate, Asst. Atty. Gen., for the State.

There was no error in rulings on evidence, nor in refusal of charges. Parish v. State, 30 So. 474, 130 Ala. 92.

BRICKEN, P. J. The indictment contained three counts, and there was a general verdict returned by the jury, "Guilty as charged in the indictment."

Numerous insistences as to the sufficiency of the several counts of the indictment were made in the court below, and the rulings of the court on these questions are here urged as being error.

[1, 2] The offense charged was "assault with intent to rob." There is no statutory robbery in this state. The common law prevails in Alabama as to this offense; and robbery, at common law, is an offense against both person and property, and is briefly defined as the felonious taking of money, or goods of value, from the person of another, or in his presence, by violence to his person, or by putting him in fear. The only statute on the subject of robbery in this state is section 5460 of the Code of 1923, and this statute merely prescribes the punishment for the commission of the common-law offense.

[3] Counts 1 and 3 of the indictment follow the form prescribed in Code 1923, p. 480 (form 16), and were sufficient.

[4-7] By elaborate briefs of counsel it is earnestly insisted that count 2 of the indictment was fatally defective, in that said count charges an assault upon James Hester, who was at the time acting as cashier of the First National Bank of Russellville, Ala., a corporation, with the felonious intent, by violence to his person or by putting him in fear of some serious and immediate injury to his person, to rob said First National Bank of Russellville, Ala., a corporation. The contention is "that an indictment which charges an assault upon 'A.' with intent to rob 'B.' would be absolutely bad." We cannot accede to this proposition as relating to the count of the indictment here. This court judicially knows that a cashier of a bank is the officer thereof who is intrusted with, and whose duty it is to take care of, the cash or money of such bank; or, in other words, that the cashier of a bank is the custodian of the funds of such bank, and, by the great weight of authority, the words "taking from the person of another," as used in connection with the common-law definition of robbery, are not restricted in application to those cases in which the property taken is in actual contact with the person of the one from whom it is taken, but include within their meaning the taking by violence or intimidation from the person wronged, in his presence, of property which either belongs to him or which is under his personal protection and control. To constitute robbery it is necessary, of course, that the property taken should be that of some other person than him who takes it, but it is not necessary that it should be the property of the person from whom it is taken. Thus a felonious taking by force has been held to be robbery where the property taken was in the lawful possession of a bailee, agent, or employee of the owner. We regard what has been said as being a sufficient answer to the insistences made in connection with the alleged invalidity of the indictment.

In addition to the plea of "not guilty," the defendant interposed the special statutory plea of "not guilty by reason of insanity."

The following "statement of facts" is quoted from briefs of counsel, and the essential part thereof appears to be borne out by the record:

"Statement of Facts.

"William J. Douglass was born and reared in Russellville, Franklin county, Ala. He was 32

years of age at the time of the alleged offense. Young Douglass is the son of a prominent family and the oldest of several boys, all of whom were well educated, one a doctor, one a lawyer, and two of them school teachers. The defendant was educated in the grammar school and high school of Russellville, and finished his education as a mining engineer in the Michigan School of Mines. All of the evidence in the case touching upon the subject shows that young Douglass had been both boy and man of a most excellent character and habits. Some of his schoolmates, testifying in the case, stated that he was a very bright student, and always led his classes, but that he was peculiar. He was given to isolation, and had few associates, and no bad habits. The evidence shows that young Douglass was stricken as a child with infantile paralysis, that several operations had been performed, but that he was never strong, carrying with him into manhood a badly crippled foot. After his graduation as a mining engineer, and on entering his profession, he found that his crippled condition was such that he was so handicapped that his education as an engineer was practically thrown away. He brooded much over that. The war came on, and his brothers and associates joined the army, but by reason of his physical condition he was rejected, and he became sensitive on that subject. He then entered the oil fields of Scottsville, Ky., together with his father, and lived at Scottsville for two or three years. He was a single man, and lived with a Mrs. Porter. His success in the oil fields was indifferent. His health became generally very poor, and his brooding, sensitiveness, and isolation increased. He was in love with a young lady in Scottsville, and they were engaged to be married. The summer of 1923 came and found him in Scottsville, Ky., a physical and mental wreck.

"As the summer months approached he became irritable, cut his friends, and spent hours upon hours alone, staring into space, brooding constantly over his misfortunes. He condemned himself, passed sentence upon himself, and sought to carry that sentence into effect by self-destruction. One afternoon he went several miles from Scottsville to the river to drown himself, and a party of bathers and merrymakers appeared upon the scene and interrupted his intended suicide. This is disclosed by some of the Scottsville witnesses, and by letters which he wrote to his father and to his sweetheart. These letters would melt a heart of stone, and show clearly the insanity of the boy. An incident of importance in this case was the fact that he had borrowed from a Scottsville bank $160 and had executed his note and signed his father's name as security. Both the banker and his father testified that the boy had full authority to sign his father's name to a note at the bank, and the banker testified that he would have loaned the boy the money without his father's signature, but for the rules of the bank. This note was about to come due, and the young man had no funds to pay it. He insanely reached the conclusion that he had committed an unpardonable moral wrong in signing his father's name to that note, and that if his father and mother found it out he would be forever disgraced in their sight. He dwelt upon this in the letter to his father which he left in his room at Scottsville, and in the letter which he had upon his person when he shot himself in the bank. In his letters he referred to this incident as the only wrong he had ever committed except the wrong of being a failure in life. In his diseased mind he determined to prevent his father and mother from knowing this, and concocted an apparently shrewd but impossible scheme to rob the bank at Russellville to get, as he expressed it, a small amount of money, and, failing, to kill himself. Both of these things he attempted to do, and fortunately failed in both.

"The court will read with care the evidence in the case, and will note that the bank which the young man attempted to rob was located, not only in the town of his nativity, and where his father and mother lived, but in a building owned by his father. His fanciful disguise, his assuming to be deaf and dumb, his actions in the bank, all show that it was the shrewd but impracticable scheming of a madman. In the note he handed in to the cashier of the bank he used the language, 'Don't press a button or give any alarm.' He well knew there was no push button system in the building or in the bank. He stated in the note that he only wanted a little money, and he stated to his father in the letter which was on his person that he was not going to steal the money, he was simply going to take it. Crazy as he was, pride and principle still remained and asserted itself."

The further "statement of facts" is quoted from brief of associate counsel for appellant:

"In August, 1923, W. J. Douglass, age thirty-two years, entered the First National Bank, located in a building owned by his father, in his native city, and, after several aimless visits to the cashier's window, returned there and presented to him a lengthy note indicating several things for him and his assistant to do. The cashier and assistant fled from the bank instead of complying with the directions given them. After the departure of the cashier, and after the assistant cashier, apparently, had left the banking room, the defendant fired a shot in the direction of the fugitives, when they were out of sight, and then turned his revolver on himself. He inflicted thereby an almost fatal wound, crushing in the frontal skull on the brain."

[8-11] There are two prevailing presumptions in this case: (1) The innocence of the defendant. This presumption is evidentiary in its nature, and attends the accused throughout the trial or until his guilt is proven by the required measure of proof and the established rules of evidence. (2) The sanity of the defendant. The statute places upon the accused the burden of proving that he is irresponsible, and this to the reasonable satisfaction of the jury. Section 4572, Code 1923. The measure of proof and apparently undue burden resting upon the defendant by virtue of the statute, supra, has been the subject of much discussion, and there exists a wide diversity of opinion upon this question. There is no doubt that the required measure of proof, "that the accused must clearly prove to the reasonable satisfaction of the jury that he is irresponsible," is materially different from the general rule in this and probably

every state in the Union, where the rule prevails that to authorize a conviction the evidence must be such as to establish beyond a reasonable doubt every element which is a necessary constituent of the offense; and the further rule prevails that the defendant is entitled to an acquittal, if the jury, after considering all the evidence, entertain a reasonable doubt of the guilt of the accused, arising qut out of any part of the evidence. It is elementary that no person can commit an offense who is not legally capable of committing a crime. In other words, the act, whatever may be its results, cannot amount to an offense unless the person who commits the act is legally capable of committing an offense. However, under the rule stated, a reasonable doubt as to the irresponsibility of the accused will not authorize the jury to acquit. He must clearly prove his irresponsibility to the reasonable satisfaction of the jury. This established rule in this state must govern and control this court, without reference to the individual opinion of the writer.

[12, 13] Notwithstanding the great volume of evidence adduced upon this trial, it is practically without dispute or material conflict. On the one hand the defense admitted the facts as testified to by the state's witnesses who gave evidence as to the commission of the alleged offense, but contended that the defendant was insane, and therefore irresponsible for his acts.

The evidence given by the main state witnesses, Hester and Mahan, discloses a most unusual state of facts; facts abnormal in the extreme, and which were calculated to impress laymen and expert as well with the conviction that the acts of the accused complained of were the result of a disordered and deranged mind. Upon this question a vast amount of testimony was given, and the evidence of noted experts as well as that of numerous nonexperts is before us, and, being practically without conflict, superabundantly sustained the special plea interposed in behalf of appellant. This, of course, was a question for the jury, and as no motion for a new trial was made, the appellant cannot be given the benefit of the opinion of this court on the question as to its sufficiency.

We shall treat the questions presented in the order of their appearance in the record.

[14] The first exception noted is where the defendant propounded the following question to state witness Hester on cross-examination:

"Q. And, Mr. Hester, now, on that afternoon that you say Will Douglass went into the bank, the bank did not lose any money, did it?"

The court sustained the state's objection to this question, and defendant excepted. We do not regard this ruling as error; the question was too broad and too general, and may have related to transactions which occurred on the afternoon in question with parties wholly disconnected with the defendant. For this reason the objection was properly sustained.

[15] The defendant asked the same witness (Hester) on further cross-examination:

"Q. So far as you know, Mr. Hester, the defendant did not on that occasion get any money from the bank or attempt to get any money from the bank or from you?"

Also the question:

"Q. You don't know of any overt act on the part of the defendant to get any money from within the cage?"

To these two questions the court sustained objections interposed by the state, and in our opinion committed reversible error in these rulings. The evidence sought to be elicited by these questions was relevant for three reasons: (1) It was clearly of the res gestæ, and therefore admissible. (2) It was relevant and admissible on the question of the intent of the accused. (3) It was clearly admissible under the defendant's plea of insanity. We could elaborate fully on these propositions, but to our mind the questions involved are elementary, and there is no need to further discuss them.

[16, 17] It appears no objection was interposed to a conversation testified to by state witness Burgess Mahan between witness and Hester in the absence of defendant and after he had left the bank upon a former visit. While this conversation was irrelevant and inadmissible, because being res inter alios acta, the question is not presented for our consideration.

[18] Upon direct examination of defendant's witness G. H. Newman, the court improperly sustained the state's objections to questions relating to conduct of the accused as observed by said witness, who was shown to be intimate with defendant and in close association with him. However, the witness gave the evidence sought by these questions notwithstanding the court's rulings, and thus cured the error the court made in sustaining objections to the questions.

[19] In connection with the examination of witness Newman the following occurred:

"By defendant: Q. From having associated with him as you say you did, at the time you are speaking about, would you say he was sane or insane? [The state objected to the question because it is not shown the extent of his association or that he had been associated with him enough to be able to form an opinion about him and because it calls for a conclusion.]

"By the Court: My opinion is that the question would have to be at the time of the alleged crime, and not prior to or afterwards."

It is here earnestly insisted that this was error. However erroneous this statement by the court may have been we cannot give the appellant the benefit thereof, as no exception is shown by the record to have been reserved. This question is not presented.

[20] Upon examination of defendant's witness Robert Clemmons he was asked by defendant:

"Q. Did you find any evidence of his having been there?"

The court sustained the state's objection to the question, and properly so. The question was too general, and clearly called for a conclusion and deduction of the witness. Moreover, the witness was afterwards permitted, without objection, to testify in detail as to what he did find on the creek bank, a letter from defendant, etc.

[21] The exception reserved to the court's ruling upon the evidence of defendant's witness Wilson wherein the court sustained the state's objection to the question by defendant, viz. "Did he look like a crazy man to you when he talked that way?" will not be treated as reversible error. There was no evidence that the witness had ever seen a crazy man and knew how a crazy man would look; but aside from this, and more important, the defendant was accorded the full benefit of the rule as to the testimony of this witness wherein he was allowed to state:

"From my observation of him and my experience and association with him I think at the time he left and maybe two months before that he was an insane man at times."

And on cross-examination this witness testified:

"I think I have seen him at a time when he didn't know right from wrong."

Also:

"I don't think he knew what he was doing when I went out on the road to get him." "I don't think he knew right from wrong."

Furthermore, this witness was allowed to testify in detail to the unusual acts and conduct of the defendant on the occasion in question.

[22, 23] T. O. Helen was introduced as a witness for defendant. His testimony on direct examination disclosed that he had known the defendant for four years or longer, and he stated:

"I knew him as well as I know any other man."

He testified to his association with defendant and his opportunity of observing him, his conduct, actions, etc. In other words, he was qualified to give expression as a layman of his opinion on the question as to whether defendant was sane or insane. The defendant then propounded to witness this question: "Would you say he was sane or insane?" The court sustained the objection by state to the question. Technically, this question should have been worded differently, but we regard its effect as merely calling for the opinion of the witness on the question involved; and, where a sufficient premise is shown, as here, the law authorizes a witness, though a layman, to give expression of his opinion as to the sanity or insanity of defendant. We are of the opinion that the court committed error in sustaining the state's objection.

[24] Defendant's witness Miss Evelyn Pulham, the sweetheart, and probably fiancée, of defendant, was not permitted to answer this question: "Q. You knew him better than anybody else?" The exception here reserved is not well taken. The question called for a conclusion of the witness, and necessitated a comparison, impossible of attainment, as to how her knowledge or acquaintance with the defendant compared with every one who knew him.

[25-27] Dr. Partlow was introduced by defendant as a witness. It was shown that he was at the time of giving his evidence in this case in charge of the State Insane Asylum at Tuscaloosa, Ala., a state institution of which this court takes judicial knowledge. He qualified fully as an expert, and stated:

"In September we had 1,994 inmates."

The defendant then asked him:

"And you have on an average of that many people under your observation for a number of years?"

The state objected to this question, which was sustained, and defendant excepted. This ruling is here urged as error. We see no reason why the objection should have been interposed, nor why the court declined to let Dr. Partlow give answer. But we do not regard this ruling as important, as there was no dispute upon the question of this witness being an eminent expert on insanity. Moreover, his competency to testify as an expert was a question for the court, and not for the jury. We would not predicate reversible error on this ruling.

[28, 29] We shall not here enlarge upon the rule of evidence which provides that an expert witness may give an opinion as to the sanity or insanity of a defendant, and that he may base such opinion solely upon a hypothetical question, and without any personal knowledge or acquaintance with the individual inquired of. The rule also provides that such hypothetical questions should embrace substantially all the facts where there is no dispute as to the facts upon the question of insanity; and where there is conflict in the evidence as to facts tending to show insanity, the hypothetical question should properly embrace only the facts tending to support the particular theory, and as a rule should not contain matter as to which there is no evidence tending to support it. It has been expressly held, however, that technical accuracy as to this latter essential is not required.

[30] Several hypothetical questions which fully met the required rule, as above stated, were propounded to the expert witness on

insanity, Dr. Partlow, but upon objection by the state the court would not permit the witness to give answer. In each of these rulings there was reversible error.

[31] We discover no error in the rulings of the court upon the admission of evidence on rebuttal by the state, to which exceptions were reserved. The mere fact that the evidence sought was not strictly in rebuttal is not sufficient to put the court in error, as these questions all related to matters in which the court may exercise a reasonable discretion.

[32, 33] There were several charges refused to defendant, and in their refusal the court states the reason why said charges were refused. The reason given was "because the charges do not base the acquittal on the plea of not guilty by reason of insanity and were calculated to mislead or confuse the jury." We cannot sustain the court upon the viewpoint given as to the reason for the refusal of said charges. We regard the reasons stated as being abortive, for by no possible construction could either of said charges be construed other than as relating solely to the issue formed under and by virtue of the special plea of "not guilty by reason of insanity." The very wording of the charges all relate to this, the only real issue involved upon this trial. There was no dispute as to the conduct of defendant upon the occasion in question. Everything testified to by the state's witnesses as to the material facts was admitted. The real and only issue involved was the question of the irresponsibility of the accused at the time of the commission of the acts complained of. Moreover, the court is under no duty to give his reasons for the refusal of a charge, and certainly is not required to make any other indorsement upon a requested charge except to write the word "given" or "refused" as the case may be. However, we think the well-stated oral charge, coupled with the charges given at the request of defendant, fairly and substantially covered each of the charges refused. Where this is true the court is under no duty to give requested charges, even though such charges may and do contain correct propositions of law.

As stated by the overwhelming and superabundance of evidence adduced upon this trial, we are of the opinion that the burden resting upon the defendant to sustain his special plea was fully and thoroughly met. We regard the case at bar very similar in every respect to the hypothesized case mentioned by the Supreme Court in the case of Howard v. State, 55 So. 255, 172 Ala. 402, 408, 34 L. R. A. (N. S.) 990. Under this evidence it is almost inconceivable that this case could be carried beyond the trial court, for, aside from the merest negative and tentative evidence inconclusive on its face, the prosecution practically had nothing to rely upon except the bare presumption of sanity as hereinabove stated.

[34] It is not the purpose of the law to hold a totally irresponsible person, a person of disordered and deranged mind, accountable for his acts. Such would be unconscionable, and no state in this Union, nor has any civilized country, ever established such a rule or precedent. See Parsons v. State, 2 So. 854, 81 Ala. 577, 60 Am. Rep. 193, and the numerous cases therein cited.

Reversed and remanded.