301 So.2d 280

**Benjamin WATTS**

**v.**

**STATE.**

**6 Div. 651.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1974.

Daniel M. Spitler and Calvin M. Howard, Birmingham, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and Quentin Q. Brown, Jr., Asst. Atty. Gen., Brimingham, for the State.

LEIGH M. CLARK, Supernumerary Circuit Judge.

A jury found appellant-defendant guilty of robbery as charged in an indictment, to which he had pleaded not guilty, and fixed his punishment at imprisonment in the penitentiary for a term of fifty years. The trial court rendered judgment and sentence accordingly, and this appeal was taken therefrom.

According to the evidence in the case, the office of Fairfield Finance Company, Inc., a corporation, doing business as Bel-Air Finance Company in Birmingham, Alabama, was robbed by two armed men.

Two employees and the office manager positively identified defendant as one of the robbers.

Defendant and defendant's sister testified that on the day of the robbery he was constantly with her in Birmingham for several hours and thereafter left by plane to Las Vegas, Nevada, before the time witnesses had testified the robbery occurred. Defendant also testified that he did not participate in the robbery in any way.

A showing was introduced by the defendant that Jimmy Lee Ogletree, who had been previously convicted of robbing the finance company on the particular occasion, would testify that defendant was not present at the time of said robbery and did not participate in the crime.

Appellant takes the position that the indictment was defective in failing to aver that there was a "taking and carrying away" of property of another from his person or presence. Thompson v. State, 24 Ala.App. 300, 134 So. 679 is cited in support of this position. There is language in the cited case relative to "taking and carrying away," or asportation, but the opinion does not support appellant's position. In that case the court was distinguishing between the elements of larceny and those of robbery. In connection with the concept or definition of larceny, the term "taking and carrying away," or a derivative thereof, is usually found. Armstrong v. State, 49 Ala.App. 396, 272 So.2d 603. As to robbery, the conventional term is "taking . . . from the person of another." Cobern v. State, 273 Ala. 547, 142 So.2d 869. This difference in terminology is recognized in the forms of indictment contained in Title 15, § 259, Code of Alabama, Form 66 for grand larceny and Form 95 for robbery. The indictment here is in the form prescribed by statute, Form 95. It is sufficient to meet any requirement of asportation in the common law offense of robbery. 77 C.J.S. Robbery § 3. There is no statutory offense of robbery in Alabama. Thompson v. State, supra; Douglass v. State, 21 Ala.App. 289, 107 So. 791.

The indictment charged that the money taken, the sum of $1,371.21, was "the personal property of Homer Eugene Smith," and was taken from his person. The testimony shows that the money was actually owned by a corporation then being managed by Homer Eugene Smith, a substantial stockholder therein. Appellant urges there was a variance between the evidence and that part of the indictment alleging that the money was the property of Smith. The precise question has been decided adversely to appellant in Riggens v. State, 44 Ala.App. 275, 207 So.2d 141, wherein it is made clear that the special property right of the named victim does not necessarily involve legal title to the

property and that his rightful possession and control of the property at the time is sufficient to support a conviction.

It is insisted by appellant that "The selection of the jury in the present case violated defendant's rights as guaranteed by the Fifth Amendment to the United States Constitution, in that it provided for a selection of a jury in which there was a systematic or arbitrary exclusion, or a discrimination between persons of a particular race, namely the Negro race." The jury selection in this case commenced with thirty-six qualified jurors; fourteen were black. In the process of striking the jury, appellant, through his counsel, struck two of the black members of the venire. The State struck the other twelve. After the jury was struck, appellant invited the attention of the court to the fact that the jury was then an all-white jury and requested that he be allowed at least one black juror. The court did not comply with the request, and the case proceeded to trial by a jury of twelve white jurors. The appellant urges that this action violated "principles that require a cross section or segment of the community in the jury" and relies upon Wong Yim v. U. S., 118 F.2d 667 (CCA Hawaii, 1941). The case cited does not support appellant's contention.

It so happens that defendant could have had at least two black jurors on the jury trying him, if he and his attorney had not elected to strike two black jurors on the panel. Irrespective of that fact, however, he has misdirected his contention, in claiming that in the selection of the actual jury to try the case, as distinguished from a previous step in the process of providing a venire from which a jury of twelve was to be selected, there was discrimination against defendant's race. The actual selection, whether by striking as was done here or by challenging peremptorily, is completely in the hands of the parties, here the State on one hand and the defendant on the other. No case has been cited, and we have found no case, to support appellant's position in this respect. The cases of Ballard v. United States, 329 U.S. 187, 67 S. Ct. 261, 91 L.Ed. 181 (1946) and Ware v. United States, 123 U.S.App.D.C. 34, 356 F.2d 787, (1966) do not do so. Furthermore, the cases cited rely upon Thiel v. Southern Pacific Company, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, which points to a contrary conclusion as follows:

> "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84, 86; Glasser v. United States, 315 U.S. 60, 85, 62 S.Ct. 457, 471, 86 L.Ed. 680, 707. *This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible.* But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups." (Emphasis supplied).

Appellant's contention collides head on with Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), involving an attack upon the same method of providing a jury as the one employed in the instant case, which was based upon the same grounds, and additional grounds, as the attack here considered. It was therein stated:

> "With these considerations in mind, we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and oper-

ation of the challenge. The challenge, pro tanto, would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterward. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a great many uses of the challenge would be banned.

"In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it. Hence the motion to strike the trial jury was properly denied in this case."

After the trial had proceeded for a considerable period of time, during a recess out of the presence of the jury, a point was made by defendant and his counsel that he was dressed in prison garb in that on the back of his pants were the words "Alabama Board of Corrections." Defendant's counsel moved for a mistrial. Thereafter an extended colloquy ensued among the trial judge, defendant's counsel and defendant, in which the trial judge stated, "The way he has been at all times when the jury has been present this would not be available to their eye sight in any fashion whatsoever. This is the first time I have known anything of it. I am confident that no jury has seen and no juror on this jury has seen that. It is very difficult for me to see it and without it being pointed out to me what it was I would think it was some kind of chalk mark on his pants and I certainly would not be able to read it. However, I will give you the opportunity to have him taken back upstairs and let him come down in such pair of pants as you are able to provide for him if he has any pants up there. . . ." Defendant's counsel then stated that it was pointed out to him just before the court's recess in which the matter was brought to the attention of the court, and counsel then made known to the court that the defendant had told him he did not want to go upstairs and have his pants changed and that defendant refused to do so. We quote further from the colloquy as follows:

"THE COURT: All right, now, let me say this to you. I am aware of what has been pointed out to me on the back part of your trousers. It appears to be about a half inch high. The letters appear to be about a half inch high. To me they could not—would not be discernable if I glanced at that, as letters and I certainly wouldn't be able to make out what they are. Now, I am offering you the opportunity to go upstairs and I will get pants for you so that if you walk from your chair to the witness stand that this will not be made known to the jury. If you don't want to do that, that's your business. But you won't be able to reverse me from failing to accept my offer. I will tell you that.

"DEFENDANT: I continue to wear them.

"THE COURT: You want to continue to wear them. All right."

It is clear to us that defendant was contumaciously endeavoring to thwart a trial or to spike the record with prejudice of his own concoction. At any rate, the trial judge handled the matter with equanimity and fairness and without any abuse of the discretion that is vested in the trial court.

During the cross-examination of defendant as a witness relative to his acquaintance with Jimmy Lee Ogletree, the confessed and convicted robber on the occasion involved, but who according to the showing made for him would have testified that the defendant was not involved in the robbery, defendant was asked, "Now, isn't it a fact that you and Jimmy Ogletree were homosexual lovers?" There was an immediate objection and an immediate sustaining of the objection by the court, but the defendant answered, "There is not no evidence to prove that. I am not a homosexual period." The record then shows the following:

"MR. SPITLER: Don't answer that.

"THE COURT: I sustain. That's excluded for your consideration.

"MR. SPITLER: Your Honor, I would like to ask that the State not ask any more questions like that.

"THE COURT: Ladies and gentlemen, any questions concerning this area of examination has no bearing of any kind on the question of whether this defendant is guilty or not guilty. I ask you not to consider the question. I think there was a denial made to it. I ask you not to give any consideration to even the question being asked. It has no part in this trial."

At the next recess, and after further testimony by defendant and after two witnesses for the State had been recalled and testified, defendant's counsel requested the right to make a motion out of the hearing of the jury. Thereupon the jury retired and the following transpired:

"THE COURT: All right, sir.

"MR. SPITLER: Your Honor, we would like to make a motion for a mistrial and state as grounds therefor the incriminating question asked of the defense witness on the stand relating to homosexuality and state that there was no way to erase that question or any implication of that question in the minds of the jury.

"THE COURT: Let me say this to you, Mr. Spitler, the Court, at the time that this question was asked, had had before it some questions and answers with reference to the nature of the acquaintanceship and how much of an acquaintanceship existed between this defendant and the man, Ogletree. And the defendant had given testimony with respect to his, when he came to know the man, Ogletree, and that—he had further been asked questions as to the nature of his friendship, whether it was a close friendship and had given an answer that it was what he termed a good acquaintanceship, I believe. Bearing this in mind, and with the name Ogletree having come up in this case as much as it has as being someone who not only has been charged with this offense but has been convicted of it, the question although not a relevant question to the issue here in my mind that this jury has to resolve was not so far from the question from the matter of the acquaintanceship existing between these two men that the Court would deem that it was totally improper. I don't sanction the question. I did not sanction it at that time and I was very quick to tell the jury not to give any consideration even to the asking of the question and told the jury that even the asking of the question, all matters concerning it were excluded from their consideration. I don't think that this did this defendant any hurt so far as his trial is concerned. As I say to you, I did not sanction the asking of the question but I understand the vein in which the prosecutor did, in fact, ask it. I presume that it was in furtherance of the proposition that he was contending that there was a close acquaintanceship between the parties. And in the light of the Court's admonition to the jury immediately that they not give any consideration and that it had no part

in determining the guilt or innocence of the defendant, I am clearly to the view that this did not hurt this defendant nor prejudice him in the eyes of the jury with respect to his guilt or innocence of this charge. So I overrule your motion for a mistrial.

"MR. SPITLER: We would like to reserve an exception to that, your Honor.

"THE COURT: All right, you have an exception."

Whether the State had any information leading it to believe that it was entitled to an affirmative answer to the question asked defendant, we are not informed. If it did not, the question was highly improper and potentially extraordinarily prejudicial. We think that there could be cases in which such an implication would be so highly inflammatory that the prejudice would be ineradicable. In the particular instance, however, taking into consideration all of the circumstances, including the nature of the crime involved, the strong evidence against the defendant, his testimony and the testimony of his sister as to an alibi, and the showing as to Jimmy Lee Ogletree, we are persuaded that defendant was not a loser by reason of the question. We have the impression that this emphatic response and all the circumstances constituted strong repudiation of any contention implied by the question and that an ordinary jury, if swayed to any extent by it, would have been inclined to hold the question against the State instead of against the defendant. The trial judge, in a careful survey of the situation, made it clear that he did not consider that any substantial injury to defendant had resulted from the question. The ruling of the trial court on a motion for a mistrial because of a remark or question of the attorney for the prosecution will not be disturbed on appeal unless it clearly appears that there was an abuse of discretion. King v. State, 37 Ala.App. 443, 69 So.2d 898. See also, Boyett v. State, 42 Ala.App. 220, 159 So.2d 628 and May v. State, 42 Ala.App. 401, 166 So.2d 860, cert. denied 277 Ala. 700, 166 So.2d 865.

We have considered the entire record as required by Title 15, § 389, Code of Alabama 1940, and conclude that there is no prejudicial error therein and the judgment of the trial court should be affirmed.

The foregoing opinion was prepared by Honorable Leigh M. Clark, Supernumerary Circuit Judge, serving as a Judge of this Court under § 2, Act No. 288, Acts of Alabama, July 7, 1945, as amended; his opinion is hereby adopted as that of this Court.

The judgment in this cause is hereby

Affirmed.

All the Judges concur except CATES, P. J., not sitting.