Appellant was convicted of robbery and the jury fixed his punishment at 20 years imprisonment in the penitentiary. Prior to arraignment he was found to be indigent, and the Court appointed two experienced lawyers of the Gadsden Bar to represent him and they were appointed two weeks before the trial. At arraignment he pleaded not guilty and not guilty by reason of insanity. After sentence was imposed, he gave notice of appeal and his sentence was suspended pending appeal. Trial counsel was appointed to represent him on appeal.
Omitting the formal parts the indictment reads as follows:
 "The Grand Jury of said County charges that before the finding of this Indictment Theodis Robinson, alias Theotis Robinson, alias Theortis Robinson, whose name to the Grand Jury is otherwise unknown than as stated, feloniously took one (1) ten-dollar bill, lawful United States currency, of the value of $10.00; and ten (10) one-dollar bills, lawful United States currency, of the value of $10.00, all of the aggregate value of $20.00, the property of Shirley Hammond, from her person or in her presence, and against her will, by violence to her person, or by putting her in such fear as unwillingly to part with the same, contrary to law and against the peace and dignity of the State of Alabama."
As a preliminary matter counsel for appellant made a motion for a continuance until the next term of court on the ground that on the very day the case was called for trial, appellant informed them that at one time he had been in a mental institution in the State of Louisiana and counsel wanted more time to investigate the question of his sanity at the time of the commission of the offense, as well as his competency to stand trial and assist his counsel in his defense. The motion was made at the insistence of appellant.
The record reflects quite a colloquy between the Court, appellant and his attorneys. Appellant told the Court that he had a "mental block" and had no recollection whatsoever of the alleged crime. Based upon appellant's statement the Court was in a quandary as to whether he was competent to stand trial. Out of an abundance of precaution and in order to protect appellant's constitutional rights to a fair and impartial trial the Court questioned appellant's counsel on their judgment as to his competency to stand trial. Counsel told the Court that appellant "speaks intelligently and lucidly in discussing the case but he had no recollection of what occurred at the time the alleged offense was committed." Appellant's counsel further told the Court that appellant was capable of understanding the charge against him but because of his "mental block" he was unable to assist counsel with his defense.
Thereupon, the Court told counsel for the State and the defense that a jury trial would be had for the limited purpose of determining if appellant was competent to stand trial. The jury was qualified and each side was furnished a strike list. The Court adjourned for lunch and counsel for appellant conferred at length with him on the issue to be decided by the jury, viz., his present competency to stand trial.
When Court reconvened, counsel made known to the Court they had a matter to take up out of the presence and hearing of the jury. Counsel for both sides and appellant went to the Judge's Chambers.
From the record:
 "THE COURT: All right, do you have something to take up with the Court at this time?
 "MR. BURNS: Yes, sir. Comes now the Defendant Theodis Robinson, whatever the style of the case is, and I would like to make his formal request to withdraw his prior request for a sanity hearing. Said sanity hearing was for the purpose of determining his present ability to stand trial, and at this time after discussing it with his two Court appointed attorneys he wishes now to withdraw the said request and — I guess we could introduce his testimony into the record. I don't think he has ever been sworn, Judge. *Page 1384 
 "THE COURT: Well, I don't think he has to be sworn for arraignment. You said you wanted to plead incompetent to stand trial. Do you want to withdraw that plea?
"THE DEFENDANT: Yes, sir.
 "THE COURT: Do you think you are competent to stand trial at the present time?
 "THE DEFENDANT: I think I am competent. I don't think an untrained jury is competent enough to determine whether I am insane or not. So I had rather just go ahead on and get through the trial.
 "MR. BURNS: Well, based on that, Judge, what he has told you, at this time we would like to withdraw the formal request for a sanity hearing to determine his present competency and go into the subsitive (sic) trial of the facts.
 "THE COURT: In other words, you just want to plead insanity at the time of the offense? Is that your plea?
"THE DEFENDANT: Well, I would like to —
 "Well, I don't know whether I was insane or not. That is why I want to see a psychiatrist. All I can say is I don't remember what happened.
 "THE COURT: Are you able to talk to your attorneys and communicate with your attorneys now?
 "THE DEFENDANT: Yes, I can communicate with my attorneys to a certain degree. As far as offering them defense information that would help me in my trial, I'm not able to do it.
 "THE COURT: You don't remember what happened back then?
"THE DEFENDANT: No, sir.
 "THE COURT: Do you understand what this charge is against you?
"THE DEFENDANT: Yes, sir.
 "THE COURT: And you are able to talk to your attorneys now, but you just don't remember what happened back then? Is that what you are telling the Court?
"THE DEFENDANT: Right.
 "THE COURT: You feel like that you understand what is going on right now?
"THE DEFENDANT: Yes, sir.
 "THE COURT: All right, then you want to withdraw that plea of incompetency?
"THE DEFENDANT: Yes, sir."
Appellant filed a motion to suppress the State's evidence on the question of the identification of appellant and considerable testimony was taken on this issue out of the presence and hearing of the jury.
On the motion to suppress Detective M.J. Naler of the Gadsden Police Department testified that he had been with the Department almost nine years. That during that period of time he had conducted many lineups in which defendants were identified. He stated that on March 3, 1976, a lineup was held in which appellant was identified by the victim of the robbery. He stated there were four other black males in the lineup of the approximate age and size of appellant. He said the lineup was actually gotten up by Captain Richard Moore of the Gadsden Police Department, and that prior to viewing the lineup no suggestions were made to the victim, Mrs. Shirley Hammond. That when Mrs. Hammond viewed the lineup, she immediately made a positive identification of appellant as the man who robbed and kidnapped her in Gadsden, Alabama, on April 9, 1975.
On cross-examination Detective Naler testified that he was one of the officers assigned to investigate the robbery of Mrs. Hammond and they got the name and description of appellant from persons in the neighborhood where the robbery occurred and from the people that he rented from. That they talked to appellant's aunt who lived at 1004 Mimosa Street in Gadsden and she told the officers that she had not seen appellant since the robbery but she knew he had been in trouble before in Baton Rouge, Louisiana. The officers communicated with the Police Department in Baton Rouge and they sent a photograph of appellant to the officers in Gadsden. The officers took this photograph along with ten or twelve other photographs to Mrs. Hammond and from this display of photographs she picked out the photograph of appellant as the man *Page 1385 
who robbed her. These photographs were shown to Mrs. Hammond on April 19, 1975, ten days after the robbery.
Detective Naler further testified that they entered appellant's name, date of birth, social security number, and the charge pending against him in the N.C.I.C. (National Crime Information Center) and they received a teletype from the Puma County Police Department in Tucson, Arizona, that they had the suspect in custody. He was subsequently extradited to Alabama, and the lineup was held the day after appellant was brought back to Alabama.
Mrs. Shirley Hammond was called as a witness for the defense on the motion to suppress. She testified that on the morning the lineup was held she walked into the room and immediately identified appellant as the robber. That the officers did not tell her who she was going to view and did not mention the names of any people in the lineup. She further stated that she was not shown any photographs just prior to entering the room to view the people in the lineup.
The Court overruled the motion to suppress and the trial got under way before the jury.
Mrs. Hammond testified that she was employed as a package car driver for United Parcel Service on April 9, 1975, and that on that date around 2:00 p.m., she was delivering a package to 909 Tuscaloosa Avenue in Gadsden, Alabama. That she parked the delivery van and picked up the package and walked across the street but she made a mistake and went to the wrong house. Two black men were standing nearby talking and one of them told her the house was next door. She went next door and delivered the package and she walked back across the street to the van. As she stepped up into the package car, a black man jumped her from the back. She told him to get out and he pulled a pistol and pointed it at her and said, "_____ _____, drive." Mrs. Hammond started screaming and the man told her if she didn't shut her _____ mouth, he would blow her head off and he had the pistol pointed directly at her head.
Mrs. Hammond cranked the van and started driving down Ninth Street and the man said, "Give me your money." She pointed to her wallet which was on a shelf in the van behind where the man was sitting on the steps. He reached back and got her wallet and counted the money. She had one ten-dollar bill and ten one-dollar bills and he asked her if that was all the money she had and she said "yes," and he took the money and told her to head for Birmingham. She told him she did not have enough gas to go to Birmingham, and he told her to go to a service station. She stopped at a service station at West Meighan and 11th Street but the package van was too high to go under the shed over the gas tanks. The man told her to pull off and "Don't start nothing, I mean to get some gas." She hesitated and the bandit said, "_____ _____, pull off and don't start no _____. I had just as soon blow your head off as not to." She started for another service station and the robber handed her back the ten-dollar bill which he had removed from her wallet and told her to pay for the gas. She stopped at an independent station, but her hand was shaking so that he took the ten-dollar bill from her hand and paid for the gas. She said she did not know how much gas he bought. He then told her to go to Birmingham. She started toward the Interstate but got caught by a train and he told her to go another way and she told him there was no other way. He said he was meaning to go to Birmingham and for her not to start anything. He told her, "White folks are behind me and I have got to get out of town." She said she was scared and told him she would get him to Birmingham, "just don't kill me."
As she was driving on the Interstate, he told her she had "better be going to Birmingham," and every once in a while, he asked her how far they were from Birmingham. On the trip he told Mrs. Hammond, "I have been locked up most of my life and as soon as they catch me I will be locked up *Page 1386 
again. So life don't mean a damn thing to me." She asked him if he was going to kill her and he said, "No, I am not going to kill you, but you just get me to Birmingham." Mrs. Hammond continued to drive and just before reaching Birmingham, the robber made an indecent proposal to her and she started crying and told him that she didn't want to do that. He told her if she was going to cry about it, he wouldn't bother her and said, "As soon as we get to Birmingham, I will let you go."
She stopped at the Roebuck Plaza and told him they were in Birmingham and he could get out so that she could go back to Gadsden as it was time for her to be back saying, "Please let me go. The people from U.P.S. will be looking for me because my schedule time is up." He told her he wanted some cigarettes and forced her to go in a drugstore in the mall with him. He gave her a one-dollar bill and told her to buy the cigarettes, "but don't try anything. Just get the cigarettes." After buying the cigarettes they went outside and he told her if she would call a taxi, he would let her go. She stated that at this time he had the pistol stuck in the band of his pants. There was a telephone booth outside the drugstore and she found a taxi number in the directory and started to dial, but he took the receiver from her and dialed the number himself. He decided not to wait on the taxi and ordered Mrs. Hammond to drive him to the bus station. She did not know how to find the bus station and he ordered her to stop and get directions saying, "but that is all you had better say."
She found the bus station and parked and kept pleading with him to let her go but he ordered her to go in the bus station with him to buy a ticket. When they got inside the bus station, he did not go to the ticket window but saw a porter and told him to order a taxi and to tell the cab driver to come to the front of the bus station. She kept asking him to please let her go. She told him if he would let her go, she would not tell anyone about what he had done and said, "I won't even identify you if you will just let me go." The cab driver arrived and the bandit pulled his pistol and pointed it at him when the cab driver refused to take them to Bessemer and forced the driver to take them to Bessemer and stop at the bus station. On the way to Bessemer the bandit pointed his pistol at the cab driver and told him to hand over his wallet. The cab driver showed him that he did not have any money. When the cab driver stopped at the bus station in Bessemer, he managed to escape. The bandit told Mrs. Hammond she was going to walk the streets of Bessemer and in that area of Jefferson County looking for an automobile with keys left in the ignition. Mrs. Hammond stated they walked for hours and it was getting dark. He took her behind a church and put her on the ground and told her, "One thing you know I have got to do. I have got to ___ you." She begged him not to do that and upon objection by defense counsel, the Court cut off further questions along this line.
Mrs. Hammond further testified that she was under the bandit's control and dominion for six or seven hours and was never out of his sight from the time he first entered her delivery van in Gadsden until he let her go behind the church somewhere in the Bessemer area. During this period of time he constantly threatened her and she had an opportunity to see his face many, many times. She stated that she was scared for her life during the entire time and was afraid to try to escape for fear that he would shoot her in the back. She further stated that she could not be mistaken that appellant was the man who kidnapped and robbed her and she made a positive in-court identification of appellant as the bandit who robbed her and forced her at pistol point to drive him to Birmingham. Her husband came to Birmingham and carried her back to Gadsden.
The defense called W.A. O'Bryant, a detective with the Gadsden Police Department, who testified that on the date this robbery was committed there were no other criminal charges pending against appellant, *Page 1387 
either before or after the instant charge, to cause him to be fleeing from the police.
The evidence presented by the State was uncontradicted. Appellant did not take the witness stand in his behalf during the trial in chief.
At the conclusion of the State's case, appellant made a motion for a mistrial because of the testimony of Mrs. Hammond to the effect that the defendant told her that he had spent most of his life locked up and if he got caught he would be locked up again, "so life don't mean a damn thing to me." It is appellant's contention this statement was highly prejudicial as it tended to show that appellant was guilty of other crimes and was calculated to inflame the minds of the jury. The record reflects that appellant voluntarily made this statement to Mrs. Hammond during the enforced trip to Birmingham. Defense counsel did not object to this statement of appellant or move for a mistrial or ask the Court to instruct the jury to disregard the statement. This statement of appellant went unnoticed by defense counsel until the State had rested. This motion was overruled.
Appellant's counsel moved to exclude the State's evidence on the ground that the State had failed to prove the elements of the crime of robbery. This motion was likewise overruled.
Appellant further claims the Court was in error in overruling his motion for a continuance.
The granting or refusing of a motion for a continuance is largely within the sound discretion of the trial court and the exercise of such discretion will not be disturbed on appeal except for abuse. Haynes v. State, 40 Ala. App. 106,109 So.2d 738; Fletcher v. State, 291 Ala. 67, 277 So.2d 882; 6A Ala.Dig. Criminal Law, 586.
In Walker v. State, 265 Ala. 233, 90 So.2d 221, it was held that the trial court did not abuse its discretion in refusing to grant such a motion where the Court-appointed attorney had ten days in which to prepare the case for trial.
In Jarvis v. State, 220 Ala. 501, 126 So. 127, the Court held that eight days was sufficient time in which to prepare the case for trial.
In the instant case appointed counsel had nearly three weeks to prepare this case for trial and there was no error in refusing the motion for a continuance.
The three essential elements of the offense of robbery are: (1) felonious intent, (2) force, or putting in fear as a means of effecting the intent, and (3) by that means of taking and carrying away of the property of another from his person or in his presence, all of these elements concurring in point of time. Douglass v. State, 21 Ala. App. 289, 107 So. 791; Hardisv. State, 28 Ala. App. 524, 189 So. 216; Cobern v. State,273 Ala. 547, 142 So.2d 869.
On the question of asportation we find the following statement of the law in 77 C.J.S. Robbery § 3, pages 450 and 451:
 "In order to constitute robbery there must be a taking or asportation. In other words, it must appear that the property was taken from the possession of the victim into that of the robber. However, the crime is consummated when the robber acquires possession of the property, even if for a short time, and it is not necessary that the property be taken into the hands of the robber, or that he should have actually carried the property away, out of the physical presence of the lawful possessor, or that he should have made his escape with it. Further, the distance the property is taken may be very small, the slightest change of location whereby dominion of the property is transferred to the offender being sufficient to establish asportation. His subsequent disposition of the property taken is immaterial, and thus, if he reduces the property to his possession, the offense is complete notwithstanding he later abandons it. The taking away is a transaction which continues as the perpetrators depart from the place where the property was seized, *Page 1388 
and may, under appropriate circumstances, be deemed to continue even after such departure from the place of seizure."
The evidence clearly shows that Mrs. Hammond was a captive prisoner from the time appellant entered the package van and pointed the pistol at her and ordered her to drive him to Birmingham. The crime of robbery was committed shortly after he entered the vehicle with a gun and demanded her money and removed the money from her wallet in her presence. She was a kidnapped and helpless victim during the ride to Birmingham. True, Mrs. Hammond was present at all times. However, her status was that of a robot in carrying out the orders of appellant. Root v. State, 32 Ala. App. 253, 25 So.2d 180, cert. denied, 247 Ala. 514, 25 So.2d 182; Lambert v. State,48 Ala. App. 600, 266 So.2d 812.
A defendant has no right to receive a mental examination as to his sanity whenever he requests one and, absent such a right, the trial court is the screening agent as to such request. Pace v. State, 284 Ala. 585, 226 So.2d 645.
As we have pointed out appellant withdrew his special plea of not guilty by reason of insanity, and he abandoned the question of his competency to stand trial. This was done with a full understanding of his rights as shown by the record.
We have carefully examined the entire record for errors injuriously affecting the substantial rights of appellant and have found none. Accordingly, the judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except CATES, P.J., not sitting.