[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1044 
Harvey Lee Windsor was convicted on June 12, 1992, of the capital murder of Rayford Howard. The murder occurred during the course of a robbery of a convenience store. Following a sentencing hearing, the jury unanimously recommended that Windsor be sentenced to death. The trial court accepted the recommendation. Initially, the Court of Criminal Appeals reversed the conviction and remanded the case for a new trialWindsor v. State, 683 So.2d 1013 (Ala.Cr.App. 1993); however, this Court granted the State's petition for the writ of certiorari and reversed the judgment of the Court of Criminal Appeals. See Windsor v. State, 683 So.2d 1021 (Ala. 1994). Thereafter, the Court of Criminal Appeals affirmed Windsor's conviction. See Ex parte Windsor, 683 So.2d 1027 (Ala.Cr.App. 1994). We have now granted Windsor's petition for certiorari review. For the following reasons, we affirm the judgment of the Court of Criminal Appeals.
 Facts
At trial, the State offered evidence that Harvey Lee Windsor and an accomplice, Colon Lavon Guthrie, robbed two convenience stores. The owner of each store was fatally shot. This appeal addresses Windsor's conviction for the capital murder of Rayford Howard, who was killed in the first of those two robberies. The statement of facts set out by the Court of Criminal Appeals in its June 17, 1994, opinion included the following:
 "On February 25, [1988,] at approximately 2:00 p.m., Rayford Howard was found dead in his store in St. Clair County. He died as a result of a shotgun blast to the chest. Money had been taken from the store's cash register and the victim's pants pockets had been emptied. A witness saw someone carrying a 'sawed-off shotgun' leave the victim's store, open the breach and reload the gun, and get into a black sports car.
 "On this same day, the appellant and Guthrie were seen in St. Clair County travelling together in a black Ford Mustang automobile with gold stripes and the word 'Boss' written in gold on the sides. At approximately 1:00 p.m. that day, the *Page 1045 
appellant and Guthrie had visited Sammie Sue Wilson Osborne at her house. Ms. Osborne's house was located approximately five miles from Rayford Howard's store.
 "The automobile in which the appellant was riding was seen later that afternoon travelling at a high rate of speed in Marshall County and in Lawrence County. The automobile was also seen at Tommy's Store, a convenience store, in Lawrence County. An occupant of the car discarded two Budweiser beer cans in the parking lot of Tommy's Store.
 "The automobile was also seen at approximately 8:00 p.m. at a store in Colbert County. The attendant at the Colbert County store, Randall Earl Pepper, was killed by a shotgun blast to the head. The appellant was identified as the person running from the store and getting into the automobile. When the appellant was arrested, he had in his possession a .25 caliber automatic pistol that had belonged to Mr. Pepper.
 "The automobile in which the appellant and Guthrie were travelling had been stolen on February 23, 1988, from Connie's Quick Stop convenience store in Tiftonia, Tennessee. The automobile was recovered on February 26, at Tiftonia Baptist Church, two-tenths of a mile from Connie's Quick Stop. Guthrie's sister's house was located between Connie's Quick Stop and the Tiftonia Baptist Church.
 "When the automobile was searched, the following items were recovered: a ring of keys, a receipt from Parisian department store, a 20-gauge shotgun shell, and cigarette butts. One of the keys on the recovered ring opened a padlock that secured the rear door of Howard's store. The Parisian receipt was for a suit that Mr. Howard had purchased for his wife. The 20-gauge shotgun shell had been fired from the same gun as a shell that was recovered outside Howard's store. The appellant's fingerprint was found on one of the cigarette butts.
 "Additionally, Guthrie's fingerprints were found on Mr. Howard's driver's license, which was recovered, along with his wallet and its contents, beside the road a few miles from his store. Guthrie's fingerprints were also found on one of the Budweiser beer cans that were left at Tommy's Store in Lawrence County."
683 So.2d at 1030.
 I.
Windsor argues that the indictment charging him with capital murder was fatally defective. We hereby adopt the reasoning of the Court of Criminal Appeals in its June 17, 1994, opinion, in holding that the indictment was not constitutionally vague or fatally defective. That court stated:
 "The appellant contends that the indictment charging him with murder during the course of a robbery was unconstitutionally vague and did not sufficiently apprise him of the charges against him. The indictment reads as follows:
 " 'HARVEY LEE WINDSOR, whose true name is otherwise unknown to the Grand Jury, did intentionally cause the death of Rayford W. Howard by shooting him with a shotgun, and Harvey Lee Windsor was in the course of a committing or attempting to commit a theft of money, the lawful currency of the United States of America, a more particular denomination and description of which is otherwise unknown to the Grand Jury, the property of Rayford W. Howard, with the intent to overcome his physical resistance or physical power of resistance, while the said Harvey Lee Windsor was armed with a deadly weapon or a dangerous instrument, to-wit: a shotgun, in violation of § 13A-5-40(a)(2) of the Code of Alabama. . . .'
 "Specifically, the appellant contends that the indictment was deficient because it did not state the value of the currency that was taken.
 " 'Prior to the enactment of § 13A-8-40 et seq. of the 1975 Code of Alabama, there was no statutory robbery in Alabama and the offense was derived from the common law. See Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962); Watts v. State, 53 Ala. App. 518, 301 So.2d 280 (1974). Common law robbery required a "taking" of property from the *Page 1046 
person of another, Wilson v. State, 268 Ala. 86, 105 So.2d 66 (1958), although the amount or value of the property taken was immaterial. Sanders v. State, 289 Ala. 224, 266 So.2d 802 (1972); Harris v. State, 44 Ala. App. 449, 212 So.2d 695
(1968).
 " 'The present robbery statutes, however, do not require a "taking" of property, Marvin v. State, 407 So.2d 576 (Ala.Cr.App. 1981); Ala. Code 1975, §§ 13A-8-40 through 13A-8-44 (1975) (Commentary), so that not only is the value of the property immaterial, but also the indictment need not allege an actual theft to constitute the offense. The operative words of the current robbery statute are "in the course of committing a theft," which includes an attempted theft, Marvin v. State, supra, rather than the common law element of an actual "taking from the person." '
 "Grace v. State, 431 So.2d 1331, 1333 (Ala.Cr.App. 1982).
 "Robbery is an offense against the person and, therefore, the value of the property taken during a robbery is not an element of the crime. See §§ 13A-8-40 through 13A-8-44, Code of Alabama 1975. The indictment charging the appellant with murder during the course of a robbery was not deficient."
683 So.2d at 1032. See also Acres v. State, 548 So.2d 459,462-64 (Ala.Cr.App. 1987).
 II.
Windsor contends that the trial court should have granted his motion for a change of venue and that its failure to do so constituted reversible error. We disagree.
 "Rule 10.1(a), Ala. R.Crim. P., states, '[T]he defendant shall be entitled to a change of the place of trial to the nearest county free from prejudice if a fair and impartial trial and unbiased verdict cannot be had for any reason.' The burden of proof is on the defendant 'to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.' Rule 10.1(b). . . .
". . . .
 " ' "The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge, because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial." Nelson v. State, 440 So.2d 1130, 1132 (Ala.Cr.App. 1983). See also Trahan v. State, 450 So.2d 1102 (Ala.Cr.App. 1984).'
 "Burton v. State, 651 So.2d 641 (Ala.Cr.App. 1993). The trial court's ruling on a motion for a change of venue will not be reversed absent an abuse of discretion. Sockwell v. State, 675 So.2d 4
(Ala.Cr.App. 1993); Mullis v. State, 545 So.2d 205, 209 (Ala.Cr.App. 1989); Knighten v. State, 507 So.2d 1015, 1021 (Ala.Cr.App. 1986). To meet the burden of proof necessary to require a change in venue because of pretrial publicity, the defendant must show more than that the case generated widespread publicity. Oryang v. State, 642 So.2d 979 (Ala.Cr.App. 1993). . . . ' "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." ' Ex parte Fowler, 574 So.2d 745, 747 (Ala. 1990) (quoting Nelson at 1131); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)."
Buskey v. State, 650 So.2d 605, 609-10 (Ala.Cr.App. 1994). The trial judge questioned the veniremembers regarding their knowledge of the facts of this case. The lack of response he received when he asked which members of the venire were familiar with the case supports his denial of the motion for a change of venue. There was no abuse of discretion.
 III.
Windsor contends that the trial court erred in refusing to grant him a continuance on the date of trial. The record indicates that the defendant was represented by two attorneys, Mr. Lowery and Mr. Holladay. On the day of trial, the defense sought *Page 1047 
to obtain a continuance when Mr. Doyle, of the Capital Representation Resource Center, agreed to assist in defending Windsor if a continuance could be obtained. The continuance was sought to allow Mr. Doyle time to prepare for the trial. Upon questioning by the judge, Mr. Doyle indicated that he had not filed a notice of appearance earlier because he had thought a plea agreement had been reached. The following occurred:
 "MR. DOYLE: . . . The fact that notice of appearance was not proffered is that it was my understanding that [there] was a plea bargain agreement on the table — not a plea bargain between the prosecution and the defense. It was my understanding . . . that the court was willing, upon a plea of guilty — was [willing] to condition such a plea on a sentence of life without parole.
 "THE COURT: Now, I talked with y'all a week or so ago and told you that that was not the case.
". . . .
 "MR. DOYLE: . . . I understand the court has said that was a misunderstanding or a miscommunication. That was never on the table. I'm saying that because we understood it was on the table that we did not foresee the necessity of our becoming involved formally on trial level."
R.T. at 37-38. Whether to grant or to deny a motion for a continuance rests within the sound discretion of the trial judge. See Arnold v. State, 601 So.2d 145, 156 (Ala.Cr.App. 1992). Windsor was represented by two attorneys. The trial judge did not abuse his discretion by refusing on the day of trial to grant a continuance in order for an additional attorney to join in Windsor's defense.
 IV.
Windsor contends that the trial court erred in refusing to excuse a potential juror for cause, on the basis that she had expressed a concern regarding crime and because she knew the assistant district attorney, Lamar Williamson. We have written:
 "Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Cr.App. 1977), cert. denied, 356 So.2d 234 (Ala.), cert. denied, 439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 132 (1978); see Willingham v. State, 262 Ala. 550, 552, 80 So.2d 280 (1955); Mahan v. State, 508 So.2d 1180 (Ala.Cr.App. 1986). This determination, again, is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence."
Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989). See alsoJenkins v. State, 627 So.2d 1034, 1043 (Ala.Cr.App. 1992). The potential juror of whom Windsor complains was questioned as follows:
 "THE COURT: Ms. B., you expressed an opinion concerning the defendant's rights in a case. You indicated that you resented the fact that prisoners had certain conditions and rights, and you were concerned about crime. Does that opinion that you have keep you from listening to the evidence in this case and considering the evidence and law and render[ing] an impartial verdict in this case?
 "JUROR B.: It might. That would be a concern of mine. And being that I know Lamar.
 "THE COURT: If you considered the evidence and had to return a verdict against the side Lamar is representing, would it cause you difficulty?
 "JUROR B.: I hope not. I would do what I thought was right.
 "THE COURT: Do you feel that knowing Lamar might influence you in this case?
 "JUROR B.: I know his wife and kids. I have never been on a jury, so I don't know.
 "THE COURT: Do you feel you could listen to the evidence and return a fair and impartial verdict?
"JUROR B.: Yes.
 "THE COURT: Could you hold the State to the burden that they would have to *Page 1048 
prove beyond a reasonable doubt the defendant's guilt?
 "JUROR B.: I would have to know whatever evidence is there — you have to know for sure."
On voir dire, Juror B. stated that she felt that she could listen to the evidence and return an impartial verdict. The trial court was in the best position to determine whether she should be stricken for cause. "A trial judge's ruling on a challenge for cause is accorded great weight and will not be disturbed on appeal unless it is clearly erroneous and represents an abuse of discretion." Ex parte Taylor,666 So.2d 73, 82 (Ala. 1995), citing Morrison v. State, 601 So.2d 165
(Ala.Cr.App. 1992), and Hunter v. State, 585 So.2d 220
(Ala.Cr.App. 1991). Considering the evidence pertinent to the question, we conclude that the failure to grant Windsor's challenge for cause was not clearly erroneous.
 V.
Windsor next argues that the trial court erred in refusing to hold that the State had improperly used 9 of its 17 strikes to remove women from the jury venire. After the trial in this case, the United States Supreme Court, in J.E.B. v. Alabama,511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), extended the principle of Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to apply to gender-based strikes. Since J.E.B., several cases have been remanded for Batson-type hearings pursuant to allegations that the State used its strikes in a discriminatory way against females on the jury venire. See Hemphill v. State, 669 So.2d 1020 (Ala.Cr.App. 1995); Roy v. State, 680 So.2d 935 (Ala.Cr.App. 1995); Allen v.State, 659 So.2d 135 (Ala.Cr.App. 1994); Morris v. City ofDothan, 659 So.2d 979 (Ala.Cr.App. 1994); Talley v. State,669 So.2d 1006 (Ala.Cr.App. 1994).
The trial court anticipated that gender-based strikes would one day be subject to scrutiny. In determining that the defendant had not made a prima facie case of discrimination based on gender, the court stated:
 "THE COURT: . . . The defendant claims that the prosecutors used peremptory challenges [in a manner] which constitutes a prima facie case of gender-based discrimination. . . . The court finds from the record and subject to any attorney that has a strike sheet, that the State exercised seventeen peremptory strikes. Of the seventeen of said strikes, nine were female and eight were male. The court finds that of the twelve jurors on the panel, six are female and six are male. Of the two alternates who are seated, one is female and one is male. Realizing, of course, that [defense attorney's] assertion that there are fifty-one percent representation of females on the panel. The State has achieved a fifty percent representation. In addition, the State's strikes were eight of the seventeen, which was not quite fifty percent, were fifty percent male; and nine of the seventeen were female. That may account for the extra one percent. The court does not find a prima facie case of gender-based discrimination. . . . [T]he court finds no prima facie case to demonstrate a gender-based discrimination either in the makeup of the jury panel as it is, or the percentages of strikes exercised by the State of Alabama. For that reason, the court will not require an explanation of each and every female struck from the panel by the State. . . ."
R.T. at 290-92. "A circuit court's ruling on a Batson objection is entitled to great deference, and we will reverse a circuit court's Batson findings only if they are clearly erroneous.Branch, 526 So.2d at 625-26." Ex parte Thomas, 659 So.2d 3, 8
(Ala. 1994). In Thomas, this Court disapproved of determining whether a prima facie case was made by comparing statistics on the number of blacks on a jury to the number of blacks on the venire. We also stated:
 "We emphasize that our disapproval of the construction that has been given Harrell II
[Harrell v. State, 571 So.2d 1270 (Ala. 1990)], does not mean that an increased percentage of blacks on the jury can never be a circumstance to be considered in ruling whether a discriminatory use of peremptory strikes has been shown. In a proper case, the fact that the percentage of blacks on the jury is higher than the *Page 1049 
percentage of blacks on the venire may be a factor to be considered in deciding whether a prima facie case of discrimination has been made or rebutted."
Ex parte Thomas, 659 So.2d at 8. In determining that no prima facie case was made of gender-based discrimination in this case, the trial court considered, in addition to statistics, whether the defendant had proven a pattern of strikes that suggested discrimination. We hold, under the circumstances of this case, that an inference of discrimination was not established where 9 of 17 peremptory strikes were used to remove females from the jury venire. The trial court's finding that the defendant made no prima facie case of gender-based discrimination was not clearly erroneous.
 VI.
Windsor also contends that the State discriminatorily struck 2 of 4 African-Americans from the jury venire. The remaining two African-Americans served on the jury. The following occurred:
 "THE COURT: Primarily at this point, it is a Powers [v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991),] challenge as to the exclusion of minorities from the jury through actions of the state prosecutors. The court finds from the record that beginning the peremptory strike process, there were four blacks on the jury venire. Jurors No. 18, No. 33, No. 35, and No. 44. The State used two of its seventeen peremptory strikes to strike Juror [18] and Juror [44]. The State did not strike [Juror 35], nor did it strike Juror [33], both of whom are on the jury panel in question. The court, at this time, does not find that constitutes a prima facie case of racial discrimination under Batson-Powers and the State of Alabama Branch case [Ex parte Branch, 526 So.2d 609 (Ala. 1989)]. However, in order to preserve the record for review, in the event this court's finding that a prima facie case of racial discrimination has not occurred, if that should be reversed by subsequent review, the court at this time, in order to facilitate these proceedings, will require the State to explain for the record the race-neutral reasons, if any it has, why Juror No. 18 and Juror No. 44 were struck.
". . . .
 "MR. WILLIAMSON: No. 18 . . . was eliminated by the State's strike for several reasons. One of which, he has not been on time to any jury assemblies that we have had over the course of the last day and three-quarters. He has either not appeared or [has] been habitually late. He appeared yesterday under the influence of alcoholic beverages. Yesterday he was up here under the influence of alcoholic beverages. He has stated to the court two separate and opposing reasons for not being able to serve — one, he had to report to his job; and the previous one was he had to find a job. He initially stated his opposition to the death penalty and then was rehabilitated. The reason for striking is he has been up here drinking for both days and has not reported to jury assembly on time at any time.
"THE COURT: What about Juror No. 44?
 "MR. WILLIAMSON: And may I further state that I have known [this juror] for several years, and he is known to be a habitual drunkard.
"THE COURT: What about No. 44?
 "MR. WILLIAMSON: [Juror 44] — the reason we struck him was, first of all, in the response to the questionnaire submitted to the jury by counsel for the defendant, a copy which I hold in my hand, and will offer for the record for the purpose of this hearing, Juror [44], when asked by the defendant's questions: 'Do you believe in capital punishment?' he answered: 'No.' On further questioning by the State's attorney, on panel voir dire, Juror [44] stated he did not believe in capital punishment except for certain cases. The court will note and the record will reflect that everyone that answered they did not believe in capital punishment, that the State eliminated them by peremptory strikes.
 "THE COURT: The court finds that the reasons set forth by the State of Alabama concerning these two jurors are race-neutral. These reasons are such that would strike any juror regardless of their race or sex. As to the objection concerning the *Page 1050 
black jurors in this case, that objection is hereby overruled and denied."
R.T. at 287-90. Based on a review of the record, we conclude that the reasons given by the prosecutor were race-neutral and that the striking of the two African-Americans from the jury did not violate Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); Ex parte Branch, 526 So.2d 609
(Ala. 1987); or Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364,113 L.Ed.2d 411 (1991).
 VII.
Windsor contends that the in-court identifications of him by Tommy Pepper and Sammie Sue Osborne should not have been allowed because, he argues, those witnesses had previously been exposed to impermissibly suggestive photographs. (He makes a similar argument regarding Bobbie Sue Osborne. However, Bobbie Sue Osborne made no in-court identification; therefore, any allegation of error in this regard is misplaced.) In considering whether the in-court identifications in this case should have been excluded, we note:
 " 'Stovall v. Denno, 388 U.S. 293
[87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967), established a due process right to exclude unreliable identification testimony that results from procedures that are both unnecessarily suggestive and conducive to irreparable mistaken identification. Neil v. Biggers, 409 U.S. 188
[93 S.Ct. 375, 34 L.Ed.2d 401] (1972), established the rule that, where the witness's in-court identification arguably stems from a suggestive out-of-court identification, the question is "whether under the 'totality of circumstances' the identification was reliable even though the confrontation procedure was suggestive," 409 U.S. at 119 [93 S.Ct. at 382], and whether there was a substantial likelihood of misidentification. Manson v. Brathwaite, 432 U.S. 98 [97 S.Ct. 2243, 53 L.Ed.2d 140] (1977), held that, where a pretrial identification is obtained by a procedure that is both suggestive and unnecessary, "reliability is the linchpin in determining the admissibility of identification testimony," 432 U.S. at 114 [97 S.Ct. at 2253], and that the reliability of the identification must be weighed against the corrupting effect of the suggestive identification procedure itself. However, identification evidence derived from an unnecessarily suggestive source need not be excluded if the totality of the circumstances indicates its reliability.'
 "Johnson v. State, 453 So.2d 1323, 1327
(Ala.Cr.App. 1984). See also Jones v. State, 431 So.2d 1367 (Ala.Cr.App. 1983). This court, quoting United States v. Briggs, 700 F.2d 408, 412 (7th Cir.), cert. denied, Schlacks v. United States, 461 U.S. 947, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983), went on further to say in Johnson, ' "It is incumbent upon a defendant to establish that the confrontation procedure in fact was suggestive prior to reaching the threshold 'totality of the circumstances' test of reliability." ' 453 So.2d at 1328.
 ". . . 'Each case is to be considered on its own facts in determining whether the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' Fitchard v. State, 424 So.2d 674, 676 (Ala.Cr.App. 1982). See Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). . . . However, assuming that the pretrial identification procedures were in fact impermissibly suggestive, '[w]hen an in-court identification of the accused is shown to have a basis independent of any pre-trial identification, then it is properly admitted into evidence.' Mullis v. State, 545 So.2d 205, 209 (Ala.Cr.App. 1989); see also Coleman v. State, 487 So.2d 1380 (Ala.Cr.App. 1986), cert. denied, 499 U.S. 911, 111 S.Ct. 1118, 113 L.Ed.2d 227 (1991); Jackson v. State, 414 So.2d 1014
(Ala.Cr.App. 1982); Matthews v. State, 401 So.2d 241 (Ala.Cr.App. 1981), cert. denied, 401 So.2d 248
(Ala. 1981). The identification is correctly received into evidence if it 'stems from an independent source rather than the photographic lineup.' Hutchinson v. State, 516 So.2d 889, 893
(Ala.Cr.App. 1987). 'Reliability is the linchpin in determining the admissibility of identification testimony.' Mullis, 545 So.2d at 209." *Page 1051 
Jenkins v. State, 627 So.2d 1034, 1046-47 (Ala.Cr.App. 1992).
Tommy Pepper identified the defendant Windsor in a photographic lineup and then identified him in the courtroom as the man he had seen running from his father's Lawrence County store on the night of his father's murder. Windsor contends that because Pepper had told an officer he had seen Windsor's picture in the newspaper before seeing the photographic lineup, his identification of Windsor in that lineup, as well as his in-court identification of Windsor, was, therefore, tainted. The trial court disagreed, stating:
 "THE COURT: After reviewing the photo lineup, the court finds the photograph in the lineup, number one, is not unduly suggestive. The court finds that there is nothing outstanding as to any particular photograph. They all appear to be white males, younger — beards and substantially the same length, although not exact — hair styles and hair color, very similar. Quite frankly, I think it is amazing that they found as many as they did.
"[DEFENDANT'S ATTORNEY]:. . . .
 "THE COURT: The only one I would say is unduly suggestive would be the guy who is standing in the front of a house — he is not Mr. Windsor — and wearing the 'Are we having fun yet?' T-shirt. That is the one that would be of any substantial difference in this. The court does not find the photo lineup in itself is in any way unduly suggestive or the manner in which it was conducted. There is the issue of the prior publication of the newspaper photo. The court cannot say that has tainted the identification. The witness states he does not even remember reading the article, although there is testimony that he told someone he did read the article. As to the motion to quash the identification, the court overrules and denies that motion.
 "[DEFENDANT'S ATTORNEY]: I object on the ground not only that it tainted the photographic identification, but it also taints the in-court identification.
"THE COURT: That is overruled."
R.T. at 728. The trial court found that Pepper's in-court identification was independent of his identification of the defendant from the photographic lineup and that the photographic lineup was not unduly suggestive. This finding is supported by Pepper's testimony that, although he did not recall telling anyone that he had seen the defendant's picture in the paper before identifying the defendant in the photographic lineup, he got a good look at the defendant on the evening of the crime and his identification of him was independent of the photographs. The trial court did not err in allowing Pepper to identify the defendant or in admitting evidence of the out-of-court identification.
Sammie Sue Osborne testified that she had seen Colon Lavon Guthrie and a friend of Guthrie's, whom Guthrie called "Harvey,"[1] at her home on February 25, 1988. She testified that on that occasion Windsor sat across from her at the kitchen table. Like Pepper, she also testified that her in-court identification was based on an independent recollection; specifically that her independent recollection was based on the defendant's visit to her home. Under the facts, we conclude that the identification was reliable, and we note that the record contains no evidence suggesting misidentification.
 VIII.
Windsor argues that the "be on the lookout" bulletin ("BOLO") issued by law enforcement officials to officers in North Alabama and Tennessee was not based on an "articulable and reasonable suspicion" and that, therefore, his arrest, which occurred pursuant to that bulletin, was illegal. Thus, he argues, Randall Pepper's pistol, the sawed-off shotgun, and other evidence recovered from the car should not have been admitted into evidence because, he argues, they were fruits of an illegal search. The BOLO, asking officers to be on the lookout for men resembling the bulletin description, contained a photograph of Windsor and *Page 1052 
Guthrie and described the vehicle in which they were thought to be traveling. The BOLO alerted the Tennessee police officer who spotted the two men asleep in a car matching the description given in the bulletin, at a rest area on or about March 6, 1988. The car was backed into the parking space, with the front tires sharply turned toward the exit ramp of the rest area. One of the occupants of the car was wearing a dark-colored ball cap, as described in the bulletin. The officer called for reinforcements. Windsor and Guthrie were thereafter arrested and charged with the murder of Rayford Howard.
Windsor contends that the admission of the items recovered from the car into evidence was improper because, he argues, the Tennessee officer did not have probable cause to arrest him. The State, on the other hand, argues that the bulletin issued by Alabama officials was based on a warrant and that the Tennessee officer had a right to rely on that bulletin.
 "[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, see United States ex rel. Kirby v. Sturges, 510 F.2d 397, 400-401 (CA7) (Stevens, J.), cert. denied, 421 U.S. 1016, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975), to pose questions to the person, or to detain the person briefly while attempting to obtain further information. See Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921 [1923] 32 L.Ed.2d 612 (1972)."
United States v. Hensley, 469 U.S. 221, 232, 105 S.Ct. 675,682, 83 L.Ed.2d 604 (1985). The evidence offered at trial indicated that a black Ford Mustang automobile with the word "Boss" on the side was reported as being driven erratically in St. Clair County on the day Rayford Howard was murdered. The tag number of that vehicle was reported to the police. That same car was seen later that day in Marshall County and at Tommy's Store in Lawrence County. Sammie Sue Osborne identified Windsor as having visited her house on the date of the murder. He was with Guthrie, and the two men were in the Mustang automobile with the word "Boss" written on it. Windsor's uncle testified that the tag bearing the number reported to the police had been on one of his cars immediately before he had a visit from Windsor. Shortly after Windsor's visit, the uncle noted that the same tag was no longer on his car.
We have reviewed the record in this case and we conclude that the events leading up to the arrest of Windsor, as evidenced by the testimony of the witnesses at trial, provided probable cause for the officer to connect Windsor and Guthrie with the robbery/murder of Rayford Howard. The BOLO identified the men by photograph and described the car in which they were traveling. The officer making the arrest did rely on the information in the BOLO in arresting Windsor and Guthrie. The items recovered from the car were not discovered as the result of an illegal arrest; therefore, they were properly admitted into evidence.
 IX.
Windsor argues that the trial court erred in allowing the State to offer evidence that Windsor participated in the robbery and murder of Randall Earl Pepper, which occurred on the same day as the robbery and murder of Rayford Howard. The Court of Criminal Appeals addressed this issue as follows in its June 17, 1994, opinion:
 " ' "Evidence of the accused's commission of another crime is admissible if such other crime is inseparably connected with or is a part of the res gestae of the now-charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence." C. Gamble, McElroy's Alabama Evidence (3d ed. 1977), § 69.01(3). See also Orr v. State, 462 So.2d 1013, 1015 (Ala.Cr.App. 1984). "Evidence of other crimes is properly admissible as part of the res gestae if all of the criminal acts are part of one continuous criminal adventure by the same party occurring within a matter of hours. Miller v. State, 405 So.2d 41 (Ala.Cr.App. 1981). *Page 1053 
See also Moseley v. State, 357 So.2d 390
(Ala.Cr.App. 1978); Summers v. State, 348 So.2d 1126 (Ala.Cr.App.), cert. denied, 348 So.2d 1136
(Ala. 1977)." Pettaway v. State, 494 So.2d 884, 886
(Ala.Cr.App. 1986). In the present case, this evidence "was intimately connected with the same transaction which is the basis of the State's case. . . . The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge." Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App. 1987), and cases cited therein. "The trial court did not err in overruling appellant's objection to the admission of such evidence. No matter how many distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which the defendant is charged." Coleman v. State, 487 So.2d 1380, 1385 (Ala.Cr.App. 1986), and cases cited therein.'
 "Rowell v. State, 570 So.2d 848, 852 (Ala.Cr.App. 1990).
 "The evidence presented at trial tended to show that the robbery-murder in this case and the robbery-murder of Mr. Pepper were part of a continuous criminal adventure. Each robbery-murder was committed in a similar manner on the same day. It was not error to receive evidence of another criminal act that was a part of a continuous criminal spree. Rowell, 570 So.2d at 852."
683 So.2d at 1035. We agree with the analysis of the evidence by the Court of Criminal Appeals. The robbery and murder of Rayford Howard and the robbery and murder of Randall Earl Pepper occurred only hours apart, on the same day. Both victims were convenience store owners, and the crimes were factually similar. Therefore, the trial court did not err in admitting evidence regarding Windsor's participation in the robbery and murder of Randall Earl Pepper.
 X.
Windsor contends that the trial court erred in allowing Bobbie Sue Osborne and Sammie Sue Osborne to testify that they heard Colon Lavon Guthrie refer to his companion as "Harvey" when the two men visited Bobbie Sue's house and when they visited Sammie Sue's house. The record indicates that any error was not objected to during the defendant's trial. The Court of Criminal Appeals, reviewing this issue in accordance with the plain error rule, see Rule 45A, Ala.R.App. P., found no error. That court, in its June 17, 1994, opinion, quoted C. Gamble,McElroy's Alabama Evidence:
 " 'A statement which is useful in identifying a person, time, place or other thing is admissible for that purpose and, therefore, is not [inadmissible as] hearsay.' C. Gamble, McElroy's Alabama Evidence, § 273.01 (4th ed. 1991)."
683 So.2d at 1034. We note the following statements from the Court of Criminal Appeals:
 " ' "A statement which is useful in identifying a person, time, place or other thing is admissible for that purpose as a hearsay exception. The statement, of course, may not be considered as evidence of the truth of the matter asserted but only for the limited purpose of identification.'
 " 'While there is a split of authority on this issue among the different states, the rule above cited is the law of Alabama, Anno. 71 A.L.R.2d 449, at 482-85, 491 (1960). The fact that a third person observed another identify the defendant is "an independent fact to which the witness . . . could testify just as to any other fact." Key v. State, 240 Ala. 19, 20, 197 So. 364 (1940), relying on Green v. State, 96 Ala. 29, 11 So. 478 (1891); see also State v. Wilson, 38 Wn.2d 593, 231 P.2d 288, cert. denied, 342 U.S. 855, 72 S.Ct. 81, 96 L.Ed. 644 (1951).' "
Ferguson v. State, 401 So.2d 204, 207-08 (Ala.Cr.App. 1981), quoting Abercrombie v. State, 382 So.2d 614 (Ala.Cr.App. 1980). The testimony of Bobbie Sue Osborne and Sammie Sue Osborne was offered to identify Windsor and to place the two men together. Because the testimony was offered to establish identity — that the man with Guthrie on the two occasions was this defendant, Harvey Lee Windsor — it was admissible under the exception to the hearsay rule. *Page 1054 
 XI.
Windsor argues that the security measures taken at his trial, and, in particular, in front of one panel of the jury venire, were prejudicial to him. Defense counsel made the following objection:
 "DEFENSE COUNSEL 1: I would object to the police officer show of force. Essentially, every time Mr. Windsor makes a move, they are going toward him or their weapon. We would object to that fact.
 "THE COURT: Which police officer has gone for his weapon?
 "DEFENSE COUNSEL 1: I'm saying every time he moves, they go after him.
 "THE COURT: For the record, I'll state that every time the defendant goes somewhere, there are officers that go after him.
 "DEFENSE COUNSEL 1: In regard to him moving within this courtroom is what we are talking about.
 "THE COURT: I have been here and I have seen Mr. Windsor sit at the table and have seen him come up to the Bench, and I have seen no officers rush after him.
 "DEFENSE COUNSEL 2: Did you not see him try to come talk to me a while ago? One of the deputies told him to get back on the other side of the table. That happened.
 "THE COURT: That is on the record. I did not see that happen, but you have it on the record.
 "DEFENSE COUNSEL 1: We will be dealing with fourteen jurors. I don't want to plant the presumption of guilt in their minds prior to evidence. That is the kind of stuff — if they are using a display of force that these jurors see and it is planted in their minds that we are dealing with someone that is dangerous and is already guilty, that is the gist of my motion.
 "THE COURT: The defendant is under indictment for capital murder. There has been no bond set in this case. He is also under indictment in another court for capital murder. I see one deputy sitting with your investigator on one side of the courtroom and two more seated on the other side of the courtroom.
 "DEFENSE COUNSEL 1: Let it be noted that they are all in uniform and all carrying weapons. There are at some times as many as five in the courtroom and all in uniform.
"THE COURT: Not all are in uniform.
 "DEFENSE COUNSEL 1: I know they are doing their job. The point of this is we are defending someone here in front of a jury of an obvious serious offense. I don't want the activities of the police officers to create prejudice and bias in their minds that this guy is such a hardened criminal that they have to jump him every time he makes a move.
 "THE COURT: The order of this court is that Mr. Windsor is allowed unlimited contact with his counsel. I have allowed your law clerk to sit at the table. Any discussion that he wishes there or at the bench is no problem. However, when he goes to the rail and has contact with other individuals, at that point it becomes a security risk. I think the officer has every right to intervene at that time.
 "DEFENSE COUNSEL 2: Judge, he was not at the rail a while ago.
 "THE COURT: I didn't see it, but I thought that was what you meant.
 "DEFENSE COUNSEL 1: I would like the record to show that Mr. Windsor has not made any attempts to leave this room. His only attempts to leave this room [—] his only attempts have been to communicate with his lawyers and his family. That was in the middle of this courtroom. He has not made any attempt to leave this courtroom without supervision of these police officers.
". . . .
 "THE COURT: Listen, gentlemen, the court has not seen up to this point any activity of the deputies that would, in this court's opinion, prejudice the defendant. . . . The defendant should not have a degree of security that would prejudice his rights in front of the jury. I don't see any that has occurred. No one, at this time, is standing within fifteen feet of the defendant. I honestly did not see the incident you are talking about. *Page 1055 
"DEFENSE COUNSEL 2: Judge, it happened.
 "THE COURT: That was not brought to the court's attention.
 "DEFENSE COUNSEL 2: I couldn't, Judge. It is hard for me to do that when the jury is sitting in here.
 "THE COURT: [Defense counsel], you may approach the Bench . . . anytime there is something that needs to be taken up.
 "DEFENSE COUNSEL 2: I'm saying the impression that it created in that jury panel's mind, it affected them. I could tell.
"THE COURT: What panel was that?
 "THE COURT: Do you want the entire panel struck for cause?
"DEFENSE COUNSEL 2: No, I'm not saying that.
 "DEFENSE COUNSEL 1: No, Judge, we are not saying that. I'll accept what you said a while ago.
 "THE COURT: I have seen nothing that prejudiced the rights of the defendant as far as the law enforcement. There are three to five deputies in this courtroom at all times. I think in a normal trial, there are at least two. I don't see their presence as imposing any prejudice."
R.T. at 259-64.
The Court of Criminal Appeals has written:
 "The degree of restraint necessary has historically and wisely been left to the discretion of the trial court. Faire v. State, 58 Ala. 74 (1877); Martin v. State, 51 Ala. App. 405, 286 So.2d 80 (1973).
". . . .
 "It is not necessary that there be a formal record of a certain type of misconduct to justify the posting of armed guards. Within constitutional limits, great weight must be accorded the discretion of the trial court. The trial judge is responsible for maintaining order in his courtroom. He understands infinitely better than we what is necessary to perform his duty."
Goodwin v. State, 495 So.2d 731, 733 (Ala.Cr.App. 1986). The trial judge did not witness the incident the defendant says was prejudicial, Furthermore, defense counsel did not immediately bring the alleged incident to the court's attention. Considering the fact that Windsor was charged with a capital offense, we conclude that the number of guards in the courtroom was not excessive. There having been no abuse of the trial court's discretion in this regard, no reversible error occurred.
 XII.
Windsor contends that the State violated a pre-trial discovery order when it failed to produce photographic enlargements of certain palm prints and fingerprints of the defendant. The trial court held a hearing outside the presence of the jury and made the following determination:
 "The court renews its finding and cannot find that the evidence — this fingerprint stuff — was in the possession of the district attorney and not made available to the defendant in a timely fashion. The main problem with this case is the evidence in this case has been in St. Clair County, Colbert County, and one or two courts of appeals, and collected from different sources at different times. The court has made available fingerprint records and the court granted this morning the defendant funds for a fingerprint expert. The court cannot find the court's order has been violated by the State. The court will require the State to refrain from any other testimony concerning fingerprints for the remainder of the day, and allow the defendant a chance to review these fingerprint documents which are now in [his] possession."
The Court of Criminal Appeals found "no evidence that the State failed to make that evidence available as soon as practicable in this case." 683 So.2d at 1034. The trial judge gave the defense additional time to examine the materials before allowing the State to present testimony in relation thereto. We agree with the Court of Criminal Appeals that there was no violation of the discovery order.
 XIII.
Windsor contends that there was insufficient evidence to convict him of the *Page 1056 
crime of capital murder because, he argues, the evidence offered against him at trial was almost entirely circumstantial. The Court of Criminal Appeals has written:
 "In evaluating the sufficiency of the evidence to convict the appellant, we view the evidence in 'the light most favorable to the State,' as the jury may have interpreted it. McMillian v. State, 594 So.2d 1253, 1263 (Ala.Cr.App. 1991). . . . . [C]ircumstantial evidence is not deficient evidence; it 'is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Hinton v. State, 548 So.2d 547, 558
(Ala.Cr.App. 1988), aff'd, 548 So.2d 562 (Ala.), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
 " 'A defendant's guilt may be established by circumstantial evidence as well as by direct evidence. As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. In reviewing a conviction based on circumstantial evidence, "[t]he test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable [hypothesis] except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." '
 "McMillian, 594 So.2d at 1263 (citations omitted). See also Potts v. State, 426 So.2d 886 (Ala.Cr.App. 1982), aff'd, 426 So.2d 896 (Ala. 1983). This statement of the law refers to cases in which the evidence is entirely circumstantial.
 " ' "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust." '
 "White v. State, 546 So.2d 1014, 1022-23
(Ala.Cr.App. 1989), quoting Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969)."
Jenkins v. State, 627 So.2d 1034, 1040 (Ala.Cr.App. 1992). The evidence offered at the trial placed Harvey Lee Windsor in the company of Colon Lavon Guthrie on the date of the crime. The two men were identified as being in a Ford Mustang automobile bearing the word "Boss" and matching the description of the vehicle used by the suspects, and bearing a license plate that had been on an automobile in the yard of Windsor's uncle. The Mustang automobile, when the police recovered it, contained articles tying the automobile and Windsor to the murder of Rayford Howard. A review of the record convinces this Court that the evidence was sufficient for a jury to find Harvey Lee Windsor guilty of the capital murder of Rayford Howard.
 XIV.
Windsor contends that the trial court committed error when charging the jury on the theory of complicity because, he argues, the jury was not instructed that the intent to rob was a necessary element of the crime. The jury was charged as follows:
 "Ladies and gentlemen, the State seeks to prove the guilt of the defendant of the acts comprising the capital murder as charged in the indictment through the theory of complicity or . . . accomplice liability. The State has presented evidence concerning the accomplice liability or complicity. One who procures, assists, or counsels another to commit a crime, is guilty as a principal — guilty as the person who actually did the offense, even if he is absent when the events occur. In order to hold an individual liable of a criminal offense as an accomplice, the State must prove beyond a reasonable doubt that he aided and abetted in the crime. The term 'aided and abetted' comprehends all assistance rendered by acts or words of encouragement or by support, actual or constructive presence to render assistance should it become necessary [sic].
 "If such is proven beyond a reasonable doubt, then the accomplice is as liable as the principal who actually performed the act. However, in order to prove the charge of capital murder by accomplice liability, the State must prove beyond a *Page 1057 
reasonable doubt that the accomplice had a particularized intent to kill. This is because, as you may recall, that capital murder involves an intentional murder. If you are not convinced that the defendant, Harvey Lee Windsor, had an intent to kill or intended to kill, then you may not find him guilty of capital murder.
 "I charge you there can be no conviction for capital murder absent this finding beyond a reasonable doubt that the defendant possessed an intent to kill.
 "To be a capital offense, the murder of the intentional-killing type must have been committed during the robbery in the first degree. The phrase 'during' in the course of or in connection with or in immediate flight from the commission of the robbery in the first degree [sic].
 "In this case, if you are convinced beyond a reasonable doubt that the defendant committed a crime of robbery in the first degree as previously defined, and during the course of that robbery, the defendant committed the murder of the intentional-killing type of Rayford Howard by means alleged in the indictment, then the second component of the capital offense as charged in the indictment would have been proven."
R.T. at 1056-57 (emphasis added). Previously, the trial court had defined robbery in the first degree as follows:
 "The two components of the capital offense, as I said, are robbery in the first degree and intentional murder or murder of the intentional-type committed during the robbery in the first degree.
 "A defendant commits the crime of robbery in the first — let me back up a minute. What I'm going to do now is — I told you the offense involves two parts: intentional murder and robbery in the first degree. What I'm going to do for you is define the material elements of each offense. . . .
 "A defendant commits the crime of robbery in the first degree if he uses or threatens to use a force against the owner of personal property while in the course of committing a theft of personal property with the intent to overcome his physical power of resistance in order to compel his acquiescence in the taking of a personal property, and in the course of a theft, he is armed with a deadly weapon or dangerous instrument. That is the definition of robbery in the first degree. In that definition I have used some words that are going to need to be defined further.
 "I said if the defendant threatens or uses force against the owner of a personal property while in the course of committing a theft. That constitutes a robbery. Then, if he is armed with a deadly weapon, that is robbery in the first degree. What does the phrase 'in the course of committing a theft' mean? It means acts which occur in the attempt to commit or in the commission of theft. What is a 'theft'? A theft of property is accomplished — or a person commits the crime of theft of property if he knowingly obtains or exerts unauthorized control over the property of another with the intent to deprive the owner of that property. The property that is alleged in the indictment that was taken is money or currency.
 "Notice I said 'using force in the committing a theft or the attempt to commit a theft' [sic]. An attempt occurs when a person with intent to commit a specific offense does any overt act toward the commission of that offense.
 "The next definition, I told you in order to have robbery in the first degree as alleged in the indictment, defendant must have been armed with a deadly weapon. The Code of Alabama says a deadly weapon is a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious physical injury. Such term includes, but is not limited to, a pistol, a rifle, or a shotgun.
 "In this case, if you are convinced beyond a reasonable doubt that the defendant committed the crime of robbery in the first degree as previously defined, then the first component of the capital offense would have been proven. If you are convinced beyond a reasonable doubt that the defendant committed the offense of robbery in the first degree of Rayford Howard, then the State has proven the first part of the capital offense." *Page 1058 
R.T. at 1052-55 (emphasis added). A review of the jury instructions as a whole establishes that the trial court properly charged the jury.
 XV.
Windsor contends that the trial judge should have charged the jury on voluntary intoxication and manslaughter and that the trial court's failure to do so requires a reversal of his conviction. In support of his argument, Windsor contends that several witnesses testified that he had been consuming alcoholic beverages on the day Rayford Howard was murdered. He cites Anderson v. State, 507 So.2d 580 (Ala.Cr.App. 1987):
 "No matter how strongly the facts suggest that [the defendant] was not so intoxicated at the time he committed the offense that he was incapable of forming the necessary specific intent, the jury should be instructed on the lesser included offense of manslaughter where there is a reasonable theory from the evidence which would support that position."
507 So.2d at 584. The Court of Criminal Appeals noted that this issue was not presented to the trial court and, therefore, it reviewed the alleged error in light of the plain error doctrine, Rule 45, Ala. R.App. P. The Court of Criminal Appeals stated, in its June 17, 1994, opinion:
 "Although there was evidence that the [defendant] had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he [had] consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no 'reasonable theory' to support an instruction on intoxication because there was no evidence of intoxication."
683 So.2d at 1037. We agree with the Court of Criminal Appeals. We find no plain error in the court's not charging the jury with regard to manslaughter and voluntary intoxication.
 XVI.
Windsor contends that the trial court did not properly instruct the jury that Windsor could not be convicted of capital murder if it found that the intent to commit robbery was formed after Howard's death. Because Windsor did not raise this issue at trial, we review it pursuant to the plain error doctrine.
 "To sustain a conviction under [Ala. Code 1975,] § 13A-5-40(a)(2) for capital robbery-murder, the State must prove beyond a reasonable doubt: (1) a 'robbery in the first degree or an attempt thereof,' as defined by § 13A-8-41; (2) a 'murder,' as defined by § 13A-6-2(a)(1); and (3) that the murder was committed 'during' the robbery or attempted robbery, i.e., that the murder was committed 'in the course of or in connection with the commission of, or in immediate flight from the commission of' the robbery or attempted robbery in the first degree, § 13A-5-39(2). Connolly v. State, 500 So.2d 57 (Ala.Cr.App. 1985), aff'd, 500 So.2d 68 (Ala. 1986). The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing. Davis v. State, 536 So.2d 110
(Ala.Cr.App. 1987); Magwood v. State, 494 So.2d 124
(Ala.Cr.App. 1985), aff'd, Ex parte Magwood, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing. Clark v. State, 451 So.2d 368 (Ala.Cr.App.), cert. denied, 451 So.2d 368 (Ala. 1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. Thomas v. State, 460 So.2d 207 (Ala.Cr.App. 1983), aff'd, 460 So.2d 216 (Ala. 1984).
 " 'As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869
(1962), "the fact that the victim was dead at the time the property was taken would militate [against a finding] of robbery if the intervening time between the murder and the taking *Page 1059 formed a continuous chain of events [sic]." Clements v. State, 370 So.2d 708, 713
(Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723 (Ala. 1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr.App. 1984). . . .
 " 'Although robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, supra; O'Pry v. State,
[642 S.W.2d 748 (Tex.Cr.App. 1981)], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379
(Ala.Cr.App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). The defendant's intent to rob the victim can be inferred where "[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events." Thomas v. State, 460 So.2d 207, 212
(Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984). See also Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962); Crowe v. State, 435 So.2d 1371 (Ala.Cr.App. 1983); Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala. 1980); Clements v. State, 370 So.2d 708 (Ala.Cr.App. 1978), affirmed in pertinent part, 370 So.2d 723 (Ala. 1979).'
"Connolly, 500 So.2d at 63."
Hallford v. State, 548 So.2d 526, 534-35 (Ala.Cr.App. 1988). The trial court charged the jury as follows:
 "[R]emember, the State has the burden of proving the defendant guilty beyond a reasonable doubt of each of the elements of the offense. Now, I have to explain to you each element that comprises the events of capital murder — intentional murder during a robbery in the first degree.
 "A defendant commits the crime of robbery in the first degree if he uses or threatens to use a force against the owner of personal property while in the course of committing a theft of personal property with the intent to overcome his physical power of resistance in order to compel his acquiescence in the taking of a personal property, and in the course of a theft, he is armed with a deadly weapon or dangerous instrument. That is the definition of robbery in the first degree. In that definition I have used some words that are going to need to be defined further.
 "I said if the defendant threatens or uses force against the owner of a personal property while in the course of committing a theft. That constitutes a robbery. Then, if he is armed with a deadly weapon, that is robbery in the first degree. What does the phrase 'in the course of committing a theft' mean? It means acts which occur in the attempt to commit or in the commission of theft. . . .
". . . .
 "In this case, if you are convinced beyond a reasonable doubt that the defendant committed the crime of robbery in the first degree as previously defined, then the first component of the capital offense would have been proven. If you are convinced beyond a reasonable doubt that the defendant committed the offense of robbery in the first degree of Rayford Howard, then the State has proven the first part of the capital offense.
 "The second part, an intentional murder. What does that mean? A defendant commits the crime of murder of the intentional-killing type if, with intent to cause the death of another person, he causes the death of that person or another person. A person acts intentionally with respect to a result or to conduct when his purpose is to cause that result or to engage in that conduct. The defendant must intentionally as opposed to negligently, accidentally, or recklessly cause the death of the deceased in order to invoke the capital statute. The fact that someone dies or is killed during the course of a robbery does not automatically provide the intent. The intent to kill *Page 1060 
must be real and specific in order to invoke the capital statute."
R.T. at 1053-56. The jury was instructed that the intentional murder had to occur during the course of a robbery in the first degree. By giving these instructions, the trial judge adequately apprised the jurors of the facts under which they could find the defendant guilty of capital murder.
 XVII.
At the sentencing phase of the trial, the State relied on only one aggravating circumstance, specifically, that the capital offense occurred during the commission of a first degree robbery. Windsor contends that this "double-counting" is unconstitutional.
 "The practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as 'double-counting' or 'overlap' and is constitutionally permissible. Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Ritter v. Thigpen, 828 F.2d 662 (11th Cir. 1987); Ex parte Ford, 515 So.2d 48
(Ala. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.), aff'd, 577 So.2d 531
(Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
 "Moreover, our statutes allow 'double-counting' or 'overlap' and provide that the jury, by its verdict of guilty of the capital offense, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt. See §§ 13A-5-45(e) and -50. 'The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49
shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.' § 13A-5-50."
Coral v. State, 628 So.2d 954, 965-66 (Ala.Cr.App. 1992). See also Burton v. State, 651 So.2d 641 (Ala.Cr.App. 1993). The trial court correctly considered the robbery as an aggravating circumstance.
 XVIII.
Windsor argues that he was precluded from introducing certain mitigating evidence during the penalty phase of his trial. In particular, he argues that his mother was not allowed to testify regarding statements doctors made to her following a motorcycle wreck involving Windsor. We hereby adopt the reasoning of the Court of Criminal Appeals, which addressed this issue as follows:
 "The [defendant's] only witness at his sentencing hearing was his mother, Lillian Windsor. She testified that the [defendant] had grown up without much money and that he had been involved in a motorcycle accident in 1985. Mrs. Windsor testified that after the accident, the [defendant] acted differently than he had before. During her testimony concerning a visit to the hospital where the [defendant] was a patient following the accident, the following occurred:
 " 'Q: [Defense attorney]: How long did Harvey stay in the hospital?
 " 'A: [Mrs. Windsor]: Maybe three or four months.
" 'Q: He was pretty banged up?
" 'A: Yes, sir.
" 'Q: Would you go see him regularly?
 " 'A: I went down there, but they wouldn't let me in. They said, "He won't even know who you are." They said they was afraid he might hurt himself. [They] said they were not worried about him hurting anybody, but that he might try to hurt himself. They were more concerned about him hurting himself than —
 " 'Q: [Prosecution]: Judge, we object. This is hearsay as to what "they" said.
" 'THE COURT: Sustained.
" 'Q: Just tell me what you know to be a fact.'
 "Thereafter, defense counsel resumed questioning Mrs. Windsor about the [defendant's] behavior after the accident.
 "The [defendant] contends that the court's sustaining of the hearsay objection violated § 13A-5-45(d), Code of Alabama 1975, which provides that '[a]ny evidence which has probative value and is relevant *Page 1061 
to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence. . . .'
 "The court's ruling was in error because hearsay evidence is admissible at the penalty phase of a capital case under § 13A-5-45(d). error, however, does not require a reversal. The [defendant's] mother was allowed to testify extensively about the effects of the [defendant's] motorcycle accident. She testified that he broke his leg in the accident but that 'they' did not think he had received a head injury. She, however, based on her own observations, thought that he had received a head injury.
 "She also testified that, while he was in the hospital, he underwent psychiatric evaluation and was administered some tests. She felt that he improved some while he was in the hospital but that after the accident he was not the same as he had been before the accident.
 "Based on Mrs. Windsor's testimony concerning the [defendant], the court's exclusion of the hearsay testimony was not reversible error under the plain error doctrine."
683 So.2d at 1038. Mrs. Windsor testified at the hearing that "[if Windsor] done anything, he did not know he was doing it. That is all I can say. Before he had that accident, he was a healthy, happy man. He could do anything he set his mind to do. All I can say is he is not the same." R.T. at 1094. We agree with the Court of Criminal Appeals that, although the trial court did err, because Mrs. Windsor testified extensively with regard to the effects the accident had on the defendant no plain error occurred.
 XIX.
Windsor also argues that the State made several prejudicial remarks during the sentencing hearing and that those remarks require a reversal. Specifically, Windsor contends that the State improperly urged the jury to disregard any mitigating evidence; that the State misled the jury into believing that the death penalty was mandatory; that the State referred to Windsor in inflammatory and prejudicial terms; and that the State urged the jury to abjure mercy. None of these alleged errors was objected to by the defense.
 " 'While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.' Ex parte Kennedy, 472 So.2d [1106,] at 1111 [(Ala. 1985)] (emphasis in original). 'This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' Johnson v. Wainwright, 778 F.2d 623, 629
n. 6 (11th Cir. 1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). 'Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.' United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986). See also Biddie v. State, 516 So.2d 837, 843 (Ala.Cr.App. 1986), reversed on other grounds, 516 So.2d 846 (Ala. 1987)."
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App. 1990). These alleged errors were not objected to at trial. Considering them in the full context of the prosecution's remarks, we note that the court cautioned the jury near the end of the State's remarks to the jury:
 "THE COURT: Ladies and gentlemen, any arguments that do not have to do with the aggravating circumstances referred to by the State, I will instruct you to exclude any other remarks by the district attorney concerning any other factors or reasons for your decision."
R.T. at 1111. This cautionary instruction to the jury following the State's remarks cured any error.
 XX.
We have considered all of the issues raised by Windsor, and we have searched the entire record for plain error. We have also considered the appropriateness of the sentence *Page 1062 
of death. For the reasons set forth in this opinion, the judgment of the Court of Criminal Appeals affirming Harvey Lee Windsor's capital murder conviction and sentence of death is hereby affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, INGRAM, and BUTTS, JJ., concur.
[1] Windsor also alleges error in allowing Sammie Sue Osborne's testimony regarding Guthrie's identification of his friend as "Harvey." This alleged error is discussed in Section X. of this opinion.